**UNITED STATES of America, Appellee,**

v.

**Ernest Henry MATOUSEK, Appellant.**

No. 89–5325.

United States Court of Appeals,
Eighth Circuit.

Submitted Nov. 15, 1989.

Decided Feb. 1, 1990.

Douglas B. Altman, Minneapolis, Minn., for appellant.

James E. Lackner, Minneapolis, Minn., for appellee.

Before LAY, Chief Judge, and ARNOLD, Circuit Judge, and McMILLAN *, Senior District Judge.

---

* The HONORABLE JAMES B. McMILLAN, Senior United States District Judge for the Western District of North Carolina, sitting by designation.

McMILLAN, Senior District Judge.

Ernest Henry Matousek ("Matousek") appeals his conviction on two counts of bank fraud under 18 U.S.C. § 1344(a)(1). The District Court for the District of Minnesota[1], sitting without a jury, sentenced Matousek to five years imprisonment on each count, with the sentences to run concurrently.

On appeal, Matousek contends that his conduct is not criminal within the reach of the federal bank fraud statute, or alternatively, that the evidence at trial was insufficient to support a conviction. We disagree with both contentions, and affirm the decision of the district court.

## I. BACKGROUND

In 1984, Matousek was the sole proprietor and operator of a used car lot in Loretto, Minnesota. To finance his used car operation, Matousek secured a line of credit from National City Bank—Ridgedale ("Bank"), a federally insured financial institution located in Minnetonka, Minnesota. This line of credit was renewed on January 3, 1985, and was increased to $50,000.

Pursuant to the terms of the loan agreement, Matousek and the Bank executed a security agreement and a promissory note. The loan was secured by Matousek's inventory of used automobiles. Because of the risk associated with loans secured by mobile collateral, the Bank also required that Matousek provide it with the titles to specific vehicles in his inventory. Upon the sale of a car in his inventory, Matousek was required either to replace the title of the car which was sold with a title from another car of equal value, or to repay the loan in the amount secured by the car which was sold. As an added precaution, the Bank would periodically conduct an audit, confirming that the cars for which titles had been pledged actually existed and were on the car lot. In this manner, the Bank was able to monitor closely Matou-

---

1. The HONORABLE DAVID S. DOTY, United States District Judge, presiding.

sek's inventory of used cars and to insure that its loan was fully secured at all times.

On May 21, 1986, Matousek purchased three cars for his inventory at the Minneapolis Auto Auction. A short time later, the Minneapolis Auto Auction mailed the original titles for these three vehicles to the defendant. At some time after the titles were mailed to Matousek, he or one of his employees called the Minneapolis Auto Auction and claimed that the titles were never received. A representative for the Minneapolis Auto Auction applied for and secured duplicate titles for the three automobiles, and these duplicate titles were hand-delivered to an employee of Matousek's dealership on September 17, 1986.

Meanwhile, on June 6 and June 11, 1986 (*after* reporting the original titles missing, and *before* receiving the duplicates), Matousek sold two of the vehicles to Cloverleaf Motors. In each instance, Matousek provided the buyer with the original titles. The third vehicle was sold to another dealer on September 17, 1986 (the day *after* Matousek's employees received the duplicate titles).

On November 25, 1986, several months after all three vehicles had been sold, Matousek pledged the duplicate titles for the three vehicles to the Bank as collateral on the loan. On February 22, 1987, the day before an announced audit of Matousek's inventory, Matousek went to the Bank and took back the duplicate titles, and replaced the duplicate titles with titles to vehicles which he still owned.

On March 27, 1987, Matousek re-pledged as collateral the duplicate title to one of the cars which had been previously sold. The Bank detected this missing automobile in an April, 1987 audit, but the appellant explained that the car had been "recently sold." Nevertheless, feeling less secure in its arrangement with Matousek, the Bank took possession of all titles to all cars on the appellant's lot, agreeing to consider only $50,000 worth of the titles actually pledged. Among the titles which Matousek surrendered to the Bank were the three duplicate titles for the cars purchased at the Minneapolis Auto Auction and a title to

a 1984 Chevy Blazer which the appellant had purchased from an Illinois company on August 26, 1986.

On June 11, 1987, only one month *after* Matousek gave the Bank the original title to the 1984 Blazer, he applied for and received a duplicate title for the Blazer. Matousek explained that he never received the original title. On June 17, 1987, Matousek sold the Blazer to another car dealer, using the duplicate title as proof of his ownership.

Less than a month after selling the Blazer, Matousek talked to a Bank officer and convinced him to substitute the title for the Blazer, which had already been sold, for a pledged title on a car which appellant actually possessed. Matousek also took back two other legitimate titles and, in their place, pledged two of the bogus titles from the Minneapolis Auto Auction cars.

After a series of additional audits which revealed discrepancies between the pledged titles and the actual inventory, the Bank, on November 2, 1987, declared the loan in default. As a result of the loan being undercollateralized, the Bank lost approximately $23,000.

On December 2, 1988, the grand jury indicted Matousek on two counts of bank fraud under 18 U.S.C. § 1344. Matousek waived a jury trial and was convicted of both counts on April 10, 1989.

## II. DISCUSSION

### A. Criminal Conduct Under 18 U.S.C. § 1344

█ Appellant first argues that 18 U.S.C. § 1344 does not make it a crime to procure and pledge duplicate automobile titles and to misrepresent the amount and existence of collateral. Instead, Matousek would have us believe that his conduct constitutes merely an "ordinary breach of a security agreement." Title 18 U.S.C. § 1344(a)(1) provides:

> Whoever, knowingly executes, or attempts to execute, a scheme or artifice—
> (1) to defraud a federally chartered or insured financial institution ... shall be

fined not more than $10,000, or imprisoned not more than five years, or both.

18 U.S.C. § 1344.

In support of his novel position, appellant points to the legislative history of the bank fraud statute and cites the comments of the House Judiciary Committee which expressed concern about expansive interpretation of the wire and mail fraud statutes (the statutes which preceded 18 U.S.C. § 1344).

Contrary to appellant's suggested interpretation, other courts have addressed the scope of the bank fraud statute and have held that 18 U.S.C. § 1344 should be construed broadly. In *United States v. Bonallo*, 858 F.2d 1427 (9th Cir.1988), the Ninth Circuit discussed the breadth of the act in the context of a scheme to defraud a bank by manipulating transaction records involving automatic teller machines. The *Bonallo* court concluded:

> The legislative history of the bank fraud statute strongly indicates that Congress intended that it have the same broad scope as the mail fraud statute, 18 U.S.C. § 1341 *et seq*. ... Further, the House Judiciary Committee, in considering the proposed bank fraud statute, expressly endorsed the broad reading courts have given the mail and wire fraud provisions.

(Footnote omitted) 858 F.2d at 1432.

Similarly, in *United States v. Gunter*, 876 F.2d 1113 (5th Cir.1989), the Fifth Circuit has interpreted the bank fraud statute broadly. *Gunter* involved a fraudulent scheme similar to the one employed by the appellant. In *Gunter*, two automobile dealership employees were convicted of pledging to banks certificates of title for vehicles which they no longer owned. Although there was no evidence that the defendants expressly misrepresented the ownership of the vehicles, the court concluded that the conduct was criminal within the meaning of 18 U.S.C. § 1344, and upheld the convictions.

We conclude that the conduct of appellant falls squarely within the intended scope of the criminal bank fraud statute.

### B.  Sufficiency of the Evidence

[2]  Matousek also challenges the sufficiency of the evidence to support a conviction. He contends that his conduct was not an intentional scheme to defraud the bank.

In reviewing a challenge to the sufficiency of the evidence, we give the government the benefit of all of the reasonable inferences to be drawn from the evidence. *United States v. Karunatileka*, 820 F.2d 961 (8th Cir.1987). Applying this standard, we reject appellant's contention that the evidence was insufficient to support a conviction.

The evidence is uncontroverted that the appellant misrepresented the status of his inventory and the Bank surrendered good titles in exchange for worthless titles. The fact that appellant's *motives* were to avoid financial ruin does not make the *conduct* less fraudulent.

Appellant is mistaken in his argument that the government must prove, as an essential element, a reasonable reliance on the part of the Bank. As in the case of mail fraud, "reasonable reliance" by the victim of the fraud is not an essential element of the crime. *See United States v. Anderson*, 447 F.2d 833, 836 (8th Cir.1971), *cert. denied*, 405 U.S. 918, 92 S.Ct. 943, 30 L.Ed.2d 788 (1972); *United States v. Strong*, 702 F.2d 97, 100 (6th Cir.1983); *United States v. Melton*, 689 F.2d 679, 684 (7th Cir.1982); *New England Enterprises, Inc. v. United States*, 400 F.2d 58, 72 (1st Cir.1968), *cert. denied*, 393 U.S. 1036, 89 S.Ct. 654, 21 L.Ed.2d 581 (1969).

The decision of the district court is AFFIRMED.