UNITED STATES of America,
Plaintiff/Appellee,

v.

Michael SHEAHAN, Defendant/Appellant.

No. 93–3914.

United States Court of Appeals,
Eighth Circuit.

Submitted March 16, 1994.

Decided July 5, 1994.

David O. Dannis, St. Louis, MO, argued, for appellant.

Michael W. Reap, Asst. U.S. Atty., St. Louis, MO, argued, for appellee.

Before HANSEN, Circuit Judge, and HEANEY and JOHN R. GIBSON, Senior Circuit Judges.

HANSEN, Circuit Judge.

Michael Sheahan appeals the sentence he received after pleading guilty to a bank fraud offense. He contends the district court[1] erred in determining his base offense level under U.S.S.G. § 2F1.1. In particular, he contends that the district court miscalculated the amount of loss caused by his conduct and erred in finding his conduct involved more than minimal planning. We affirm.

I.

In 1988, Michael Sheahan operated Avanti Motor Company ("Avanti"), a used car dealership in Maryland Heights, Missouri. Avanti bought and sold upscale used cars and other vehicles. In July 1988, Sheahan opened two checking accounts at Rozier Mercantile Bank in St. Genevieve, Missouri ("Mercantile Bank"). He opened one of the checking accounts for Avanti and one as a personal account. He also established a "floor plan" line of credit for Avanti at Mercantile Bank to finance the purchase of used vehicles for resale. Sheahan's codefendant in this case, Larry Vogt, was the President of Mercantile Bank at that time and handled Sheahan's checking accounts and line of credit.

1. The Honorable Carol E. Jackson, United States District Judge for the Eastern District of Missouri.

Soon after Sheahan opened the checking accounts, he became overdrawn on both accounts. Vogt closed both checking accounts in December 1988, at the direction of Mercantile Bank's Board of Directors. (Sent. Tr. at 27.) Vogt, however, allowed Sheahan to continue writing checks on both closed accounts. Vogt cleared the majority of these checks by rolling them over to draw on Avanti's line of credit and debiting the Bank's general ledger, as there was no specific ledger for the closed accounts. (*Id.* at 31.) Vogt then prepared loan commitment documents to formalize these transactions as loans on the line of credit. (*Id.* at 60–61.) Sheahan would then sign a promissory note and security agreement pledging the vehicles that he acquired through this arrangement as security for the loans. As Avanti sold vehicles, it paid on the Mercantile Bank loan balance. The remainder of the checks not cleared by this method were held by Vogt, and Sheahan would come in and pay cash to cover them. (*Id.* at 93.)

While this arrangement was in place, Vogt presented requests to the Mercantile Bank Board of Directors to increase Avanti's line of credit.[2] Mercantile Bank increased the Avanti line of credit on at least one occasion. The bank received additional pledges of security from Avanti, including the pledge of Sheahan's residence as collateral, Sheahan's personal guarantee, and the limited personal guarantee ($65,000) of his father, Andrew Sheahan.

Avanti's outstanding loan balance rose substantially during the time when the arrangement was in place. In January 1989, soon after the arrangement began, Avanti's outstanding balance at Mercantile Bank hovered near $170,000. (Appellant's Rev.App. at 40.) However, by January 1990, Avanti's outstanding balance had risen to an amount routinely exceeding $400,000, rising at one point to over $500,000. (*Id.* at 44.)

Concerns eventually began to surface about the propriety of Vogt's arrangements with Sheahan and Avanti. Missouri state auditors and Mercantile Bank's own internal auditors expressed concerns over the Avanti line of credit. (Sent.Tr. at 25–26.) Richard K. Hanneken, a Vice–President of Mercantile Bank, observed Vogt driving a Jaguar automobile with Avanti's dealer license plates; Mercantile Bank under Vogt's direction, had just extended financing to Avanti on this vehicle. (*Id.* at 216–17.) These observations were reported to Vogt's supervisor. (*Id.* at 217.)[3] In an interview with FBI special agent Drew Armstrong, Sheahan confirmed that Vogt regularly drove cars with Avanti dealer license plates. (*Id.* at 332–33.)

In January 1990, Mercantile Bank received notice of an upcoming audit by the Federal Deposit Insurance Corporation (FDIC). Vogt contacted Sheahan and told him that they needed to take steps to reduce Avanti's outstanding balance. Sheahan approached John E. Fuhrer about obtaining a $30,000 loan to help Sheahan reduce his balance at Mercantile Bank. (*Id.* at 5.) Fuhrer initially declined to make the loan until Sheahan suggested that Vogt would guarantee the loan. (*Id.*) Vogt then contacted Fuhrer to offer the guarantee and Fuhrer eventually agreed to make the loan to Sheahan, which Sheahan paid over to Mercantile Bank to reduce Avanti's balance.

Sheahan also opened a checking account at Mark Twain Bank in St. Louis, Missouri ("Mark Twain"). (*Id.* at 50.) Mark Twain also began to finance vehicles for Avanti on an individual basis. (*Id.*) In late January and early February of 1990, Sheahan wrote a series of checks on his Mark Twain account payable to Mercantile Bank seeking to reduce the Avanti balance. Three of these checks, totalling $110,440, were returned unpaid for insufficient funds. (Sent.Tr. at 36–37.) Upon receipt of the checks at Mercantile Bank, but before they were presented to

---

**2.** The minutes of Mercantile Bank's board meeting of December 7, 1988, for example, specifically indicate that Vogt sponsored a request to raise both Sheahan's personal line of credit and Avanti's line of credit. (Appellant's Rev.App. at 141.) Vogt requested that Sheahan's personal limit be raised to $364,000 and that Avanti's limit be raised to $233,000. Motions were made and seconded to approve these requests.

**3.** Hanneken also testified that other Mercantile Bank Officers also drove vehicles with dealer plates from time to time, but only if the bank owned the vehicle. (Sent.Tr. at 218.)

Mark Twain and returned for insufficient funds, Vogt credited Avanti's account for payment and released collateral (vehicles) back to Avanti. (*Id.* at 84, 323–28.) Avanti subsequently used some of those vehicles as collateral to obtain additional loans at Mark Twain. (*Id.* at 86.)

When the FDIC examiners conducted their audit of Mercantile Bank in early February 1990, they discovered significant irregularities in the Avanti and Sheahan accounts. Eventually, they uncovered $569,569 in checks Sheahan had written on his closed accounts at Mercantile Bank under his arrangement with Vogt. Sheahan had written 204 checks drawn on the closed Avanti checking account totalling $446,415, and 19 checks on the other closed account totalling $123,154. The auditors found the checks in a box in the desk drawer of Vogt's secretary.

Mercantile Bank immediately terminated Vogt's employment. (Sent.Tr. at 238.) Mercantile Bank then made demand for immediate payment on the loans to Avanti (*id.*) and eventually seized a number of Avanti automobiles in which the bank asserted a security interest. (*Id.* at 389.) Some of the automobiles Mercantile Bank seized, however, turned out to be collateral for loans with Mark Twain. (*Id.* at 396.)

Mercantile Bank and Sheahan entered into a temporary "standstill agreement," which halted the seizures and provided Avanti with some time to make payments. (Appellant's Rev.App. at 91–103.) The agreement, however, broke down after a short period of time with the parties making mutual cross allegations of failure to perform their part of the agreement. Mercantile Bank and Sheahan then filed lawsuits against each other and litigated the issues for a number of months. Eventually, they entered into a comprehensive settlement of those lawsuits. Among other things, Mercantile Bank agreed to release its deed of trust on Sheahan's home and its personal guarantee from Sheahan's father, Andrew Sheahan. (*Id.* at 84–85.)

Mercantile Bank eventually renewed proceedings to collect on the outstanding Avanti debt and was able to seize and sell off some of the collateral to reduce the outstanding debt. After applying these proceeds to the Avanti debt, Mercantile Bank was left with a $338,738.50 balance remaining unpaid on the Avanti account. On December 5, 1990, Mercantile Bank wrote off the $338,738.50 on the Avanti debt as uncollectible. (Sent.Tr. at 233.) Mercantile Bank also wrote off an additional $129,800 on Sheahan's home mortgage. (*Id.*)

John Fuhrer reduced the $30,000 debt Sheahan owed him to judgment, but likewise was able to collect only $4,000 total on that debt before Sheahan discharged the debt in bankruptcy.

In May 1991, a federal grand jury returned a 24–count indictment against Vogt and Sheahan. Counts I through X pertained to the conduct of both Vogt and Sheahan; the remaining counts, XI through XXIV, pertained only to Vogt. In counts I through X, the grand jury charged Vogt and Sheahan with knowingly executing a scheme to defraud a bank in violation of 18 U.S.C. §§ 1344 and 1346. Sheahan eventually pleaded guilty to count X of the indictment, which specifically charged him and Vogt with executing a scheme to defraud Mercantile Bank by having Sheahan write three insufficient funds checks drawn on Mark Twain Bank that Vogt accepted and posted on behalf of the Mercantile Bank to reduce the balance on the Avanti account.

This offense carried a base offense level of six but was subject to upward adjustment according to the amount of loss caused by the offense. U.S.S.G. § 2F1.1. The Presentence Investigation Report (PSR) recommended an increase in the base offense level by ten levels after determining the amount of loss caused by Sheahan's conduct exceeded $500,000. *See* U.S.S.G. § 2F1.1(b)(1)(K). The PSR also recommended increasing the base offense level by an additional two levels after finding that the offense involved more than minimal planning. *See* U.S.S.G. § 2F1.1(b)(2)(A). Sheahan objected to the PSR's recommendations.

After a three-day sentencing hearing on these issues, the district court found Sheahan responsible for a loss greater than $350,000 but less than $500,000 and increased the base offense level by nine levels. The district

court reached this conclusion by specifically finding that Mercantile Bank suffered an actual loss of $338,738.50 and that Fuhrer suffered an actual loss of approximately $30,000. The district court also found that Sheahan's offense involved more than minimal planning and added another two levels to the offense level. The district court then adjusted his offense level down two levels for acceptance of responsibility, resulting in a total offense level of 15. The district court sentenced Sheahan to 18 months of imprisonment and two years of supervised release. Sheahan appeals the district court's determination of his base offense level and, in particular, the calculation of the amount of loss and the finding of more than minimal planning.

## II.

Sheahan first argues that the district court erred in calculating the amount of loss under U.S.S.G. § 2F1.1(b)(1)(K). He contends that the district court reached its erroneous conclusion by improperly considering evidence from the dismissed counts of the indictment as relevant conduct, improperly including the $30,000 loan from Fuhrer as relevant conduct, and failing to reduce the amount of loss by the value of the collateral Mercantile Bank released in settlement of the civil lawsuits with Sheahan.

### A.  Relevant Conduct—Dismissed Counts

Sheahan pleaded guilty to count X of the indictment, which charged him with writing three insufficient funds checks drawn on Mark Twain Bank that Vogt accepted and posted to reduce the balance on the Avanti account at Mercantile Bank. In determining the amount of loss, the district court also looked to the amount of loss that could be attributed to the checks written on the closed accounts, the loan agreements Sheahan signed with Vogt, and the collateral pledged by Sheahan to cover those accounts. Sheahan contends that this conduct was the factual basis for counts I through IX of the indictment, which were dismissed under the plea agreement, and that the district court should not have considered this conduct as relevant conduct in determining the amount of loss.

Sheahan concedes that we have interpreted the relevant conduct guideline, U.S.S.G. § 1B1.3, to allow the sentencing court to consider conduct beyond the count of conviction, *United States v. Galloway*, 976 F.2d 414, 425 (8th Cir.1992) (en banc), including conduct contained in dismissed counts of the indictment, *United States v. Streeter*, 907 F.2d 781, 791 (8th Cir.1990). Sheahan argues, however, that the conduct the district court considered in this case does not qualify as "relevant conduct" under U.S.S.G. § 1B1.3 for the purposes of the section 2F1.1 loss calculation and, therefore, should not have been considered. Specifically, Sheahan first contends that the conduct that was the basis of counts I through IX was not part of the "same course of conduct or common scheme or plan" as the conduct to which he pleaded guilty, writing the insufficient funds checks to Mercantile Bank drawn on his Mark Twain account. Sheahan also argues that the conduct charged in counts I through IX was not relevant conduct because that conduct does not constitute a criminal offense.

Relevant conduct is defined as all acts and omissions "that were part of the *same course of conduct* or *common scheme or plan* as the offense of conviction." U.S.S.G. § 1B1.3(a)(2) (emphasis added). This is a factual determination subject to review under the clearly erroneous standard. *United States v. Prendergast*, 979 F.2d 1289, 1291 (8th Cir.1992). Under the Guidelines, "[f]or two or more offenses to constitute part of a common scheme or plan, they must be substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purposes, or similar *modus operandi.*" U.S.S.G. § 1B1.3, comment. (n. 9). Here, Sheahan's conduct charged under counts I through IX revolving around the checks written on his closed accounts at Mercantile Bank and his conduct in writing insufficient funds checks on the Mark Twain Bank to reduce the Avanti balance at Mercantile Bank are properly considered to be part of a "common scheme or plan." Mercantile Bank was a "common victim," and Vogt was a "common accomplice" in both of these situations. Hence, the district court committed no clear error in considering the checks written on the closed

accounts to be part of the "same course of conduct or common scheme or plan as the offense of conviction."

■ Sheahan next argues that the district court should not have considered the conduct charged in counts I through IX as "relevant conduct" in determining the amount of loss under U.S.S.G. § 2F1.1 because that conduct was not criminal conduct. We agree that the relevant conduct the sentencing court should consider in the section 2F1.1 loss calculation is that which is attributable to the defendant's "criminal conduct." *See Kok v. United States,* 17 F.3d 247, 250 (8th Cir.1994) (citing *United States v. Wilson,* 980 F.2d 259, 261 (4th Cir.1992)) ("the task of the district court [under section 2F1.1] is to determine the amount of loss that is attributable to the defendant's criminal conduct"). Thus, the government had the burden of proving by a preponderance of the evidence that Sheahan's conduct as charged in counts I through IX constituted criminal conduct before the district court could consider it as relevant conduct.

Sheahan argues that his conduct charged in counts I through IX—writing the checks on closed accounts, entering into loans on the debts created, and pledging collateral to secure those loans—does not constitute criminal conduct on the facts in this case. In counts I through IX, the indictment charged Sheahan and Vogt with acting in a joint scheme or artifice to defraud Mercantile Bank of money and property or the honest services of its employee, Larry Vogt, all in violation of 18 U.S.C. §§ 1344, 1346, and 2.

■ Counts I through IX of the indictment clearly alleged offenses that are subject to prosecution under 18 U.S.C. §§ 1344 and 1346. To prove a section 1344 violation, the government must show that the defendant "executed a scheme to defraud a federally insured bank." *United States v. Britton,* 9 F.3d 708, 709 (8th Cir.1993). "The term 'scheme to defraud,' however, is not capable of precise definition." *United States v. Brandon,* 17 F.3d 409, 424 (1st Cir.1994) (quoting *United States v. Goldblatt,* 813 F.2d 619, 624 (3d Cir.1987)). We have stated:

A scheme violates § 1344(a) if the scheme is "a departure from fundamental honesty, moral uprightness, or fair play and candid dealings in the general life of the community. The bank fraud statute condemns schemes designed to deceive in order to obtain something of value."

*Britton,* 9 F.3d at 709 (quoting *Goldblatt,* 813 F.2d at 624). A scheme to defraud under section 1344 also exists where it includes activity designed to deprive the bank of the honest services of its employee. 18 U.S.C. § 1346. The government need not demonstrate that the defendant made false representations or that the bank was actually defrauded. *Britton,* 9 F.3d at 709. Moreover, the fact that a bank customer colludes with a bank officer does not prevent the offense from constituting bank fraud. *United States v. Saks,* 964 F.2d 1514, 1518–19 (5th Cir. 1992).

Because the allegations in counts I through IX are legally sufficient, the issue here is whether the government demonstrated by a preponderance of the evidence that Sheahan acted with Vogt in a scheme that deprived Mercantile Bank of Vogt's honest services or deprived Mercantile Bank of money or property. We conclude that the government satisfied this burden.

Sheahan and the government have stipulated that: the checking accounts were closed in December 1988 and that Vogt continued to allow Sheahan to write checks on the closed accounts; Vogt knew the accounts were closed and continued to allow Sheahan to write the checks without the knowledge of Mercantile Bank's Board of Directors; and this practice deprived Mercantile Bank of Vogt's honest services because this practice violated generally accepted banking procedures and was conducted without knowledge or approval of the Board of Directors. (Appellant's Rev.App. at 30–32.) On appeal, Sheahan attempts to distance himself from this stipulation by arguing that he was not a knowing participant in this practice, a prerequisite to a section 1344 violation. He thus asserts that he was not part of a "scheme" to deprive Mercantile Bank of Vogt's honest services because he did not know that the accounts had been closed. The district court

specifically found, however, that Sheahan knew the accounts were closed. (Sent.Tr., Vol. III at 8, 9.) We review this finding for clear error.

Agent Armstrong testified at the sentencing hearing that Sheahan told him in an interview that Sheahan was aware that Vogt was accepting the closed account checks, rolling them into the line of credit, and subsequently formalizing the amounts paid out by Mercantile Bank into loans. (Sent.Tr. at 31.) Sheahan indicated, however, that he did not think that the practice was out of the ordinary. (*Id.*) Armstrong also testified that Sheahan would pay off some of the checks in cash (*id.* at 92–93), which the government asserts supports an inference that Sheahan knew the accounts were closed. We cannot find that the district court committed clear error in finding that Sheahan knew the accounts were closed.[4] Hence, we conclude that the government established by a preponderance of the evidence that Sheahan's conduct with Vogt was "a departure from fundamental honesty, moral uprightness, or fair play and candid dealings," *see Britton*, 9 F.3d at 709, and served to deprive Mercantile Bank of Vogt's honest services in violation of section 1344 and 1346.

Even assuming that the government failed to prove a scheme to deprive Mercantile Bank of Vogt's honest services, we conclude that a preponderance of the government's evidence demonstrated, at a minimum, that Sheahan and Vogt participated in a scheme to deprive Mercantile Bank of money or property. For example, the government presented evidence that Sheahan and Vogt engaged in practices that were connected to the closed account checks that ultimately left Mercantile Bank significantly undersecured on the Avanti account. Sheahan double-pledged at least one item of collateral as security for a loan Avanti received from Mercantile Bank, which he previously pledged for a loan at Mark Twain. (Sent.Tr. at 325–31, 341–47). Moreover, Mercantile Bank, acting through Vogt, released other pledged collateral to Sheahan at different times without requiring replacements of additional collateral. (*Id.* at 273.) Further, much of the collateral Sheahan pledged for Avanti loans was of poor quality and worth substantially less than the amount of the loan extended. (*Id.*) These practices violated Mercantile Bank's standard practice that the loans be fully collateralized and allowed Sheahan to obtain funds from Mercantile Bank he likely would not have obtained under standard practices. These practices ultimately left Mercantile Bank with insufficient security on the Avanti debt. (*Id.* at 273.)

■ We conclude that this evidence likewise demonstrates that Sheahan and Vogt were engaged in a scheme that was a departure from "fundamental honesty, moral uprightness, or fair play and candid dealings" *see Britton*, 9 F.3d at 709, that deprived Mercantile Bank of money or property. The evidence of double pledging, itself, is enough to establish a section 1344 violation. *United States v. Matousek*, 894 F.2d 1012, 1013–14 (8th Cir.1990).

We conclude that the district court properly considered the conduct charged in counts I through IX as relevant conduct. This conduct was part of a "common scheme or plan" with the conduct under count X, to which Sheahan pleaded guilty. Likewise, the government established by a preponderance of the evidence that the conduct constituted "criminal conduct" which could be considered for the purposes of the section 2F1.1 loss calculation.

■ The district court correctly concluded that Sheahan's relevant conduct figured prominently into the loss Mercantile Bank suffered. He wrote the checks, which was the fountainhead of all the illegal conduct that followed. Moreover, he continued to participate throughout the entire scheme by engaging in other conduct in furtherance of the scheme, such as double-pledging collateral and paying off some of the checks in cash. To the extent that he argues that it was Vogt's conduct, not his own, that caused the

---

4. Sheahan contends that the government agreed in the stipulation that Sheahan did not know the accounts were closed. We disagree. The stipulation says only that "[t]he defendant contends he did not know [the accounts were closed]." Hence, the government only stipulated to his contention that he *did not know* the accounts were closed, not that he actually did not know.

losses to Mercantile Bank, that argument is unavailing. Section 1B1.3(a)(1)(B) of the Sentencing Guidelines provides that Vogt's conduct as a joint participant in criminal activity with Sheahan may be counted as Sheahan's own relevant conduct if Vogt's activities were reasonably foreseeable to Sheahan. Even if we were to assume that Vogt's conduct caused the loss, the district court would not have been in error to find that Vogt's conduct was reasonably foreseeable to Sheahan. Thus, the district court committed no error in looking to the conduct underlying the dismissed counts as relevant conduct for the section 2F1.1 loss calculation.

### B. Relevant Conduct—$30,000 Loan from Fuhrer

Sheahan makes a similar argument that the district court should not have included the $30,000 loan from Fuhrer that Sheahan failed to repay. Sheahan argues that the government failed to offer any evidence that the loan from Fuhrer was in any way related to writing the three insufficient funds checks on the Mark Twain account. Sheahan also argues that the government failed to demonstrate that obtaining the loan or using the loan money constituted criminal conduct in any way.

■ We conclude that Sheahan's conduct in obtaining the loan from Fuhrer and Sheahan's conduct in writing the three insufficient funds checks were part of a "common scheme or plan" because they involved "common accomplices" and "common purposes." U.S.S.G. § 1B1.3, comment. (n. 9). Vogt again was a "common accomplice," because he assisted Sheahan in obtaining the loan by giving Fuhrer a guarantee from the Bank. This conduct also shared a "common purpose" with the offense to which he pleaded guilty because the loan from Fuhrer, like the three checks drawn on the Mark Twain Bank, was intended to shield the scheme to deprive Mercantile Bank of Vogt's honest services.

■ Likewise, we conclude that Sheahan's conduct in obtaining the loan from Fuhrer is properly considered part of Sheahan's "criminal conduct" and, therefore, can be counted as relevant conduct for the section 2F1.1 loss calculation. The district court could fairly infer from the government's evidence that the $30,000 loan Sheahan obtained from Fuhrer was just another part of the relevant conduct charged in counts I through IX, which, as noted above, the government established by a preponderance of the evidence to constitute criminal conduct. This loan from Fuhrer served to facilitate both of the schemes encompassed in counts I through IX (to deprive Mercantile Bank of Vogt's honest services or a scheme to deprive Mercantile Bank of property or money as charged) because the funds obtained from Fuhrer reduced the balances outstanding on the Avanti account and deflected attention from the irregularities in the account. In essence, the loan was acquired for the specific purpose of helping Sheahan and Vogt avoid detection of their criminal activity. Hence, we find that the $30,000 was properly considered as relevant conduct for the purposes of the section 2F1.1 loss calculation.[5]

### C. Released Collateral

■ Sheahan next argues that the district court erred by failing to reduce its amount of loss finding by subtracting the value of the collateral Mercantile Bank released in settlement of the civil lawsuits with Sheahan. Sheahan reasons that Mercantile Bank actually is responsible for increasing the amount of the loss in this case because in settling the civil cases it released its right to recover against valuable collateral including the personal guarantee of Sheahan's father and the second deed of trust in Sheahan's home. Hence, he concludes this collateral that was available to Mercantile Bank at one time should be subtracted from the amount of loss. We disagree.

---

5. Sheahan also argues that the district court unduly restricted his cross-examination of Fuhrer during the sentencing hearing. Sheahan sought to question Fuhrer about the risky, high-interest loans he made and to impeach his credibility by showing that he is a loan shark who charges

usurious rates and would make a loan to anybody. (Sent.Tr. at 12–13.) The district court sustained the government's relevance objection to this questioning. The district court committed no error.

We have recently held that the amount of loss calculation "did not turn on whether [the bank] recovered *or could have recovered* its potential loan losses by foreclosing on the pledged security." *United States v. Morris,* 18 F.3d 562, 570 (8th Cir.1994). Thus, the amount of loss is not affected by whether the victim could have recovered from additional collateral. Moreover, we have even held that the loss calculation is not reduced where the victim actually recovers money from the sale of collateral or from restitution. *See Prendergast,* 979 F.2d at 1291–92; *United States v. Johnson,* 908 F.2d 396, 397–98 (8th Cir. 1990). Hence, even if Mercantile Bank would not have released its interest in the additional collateral in this case, the availability of that collateral to Mercantile Bank would not reduce the loss calculation for the purposes of section 2F1.1. The district court committed no error in declining to reduce the amount of loss finding by the value of the collateral Mercantile Bank released.

### III.

■ Sheahan's final argument is that the district court erred in finding that his offense involved more than minimal planning under U.S.S.G. § 2F1.1(b)(2). We review a sentencing court's finding of more than minimal planning for clear error. *United States v. Sykes,* 4 F.3d 697, 699 (8th Cir.1993).[6]

■ After carefully reviewing the record, we conclude that the district court's finding of more than minimal planning is amply supported by the record. The district court noted that the scheme existed for more than a year and involved substantial contact and coordination between Sheahan and Vogt. This evidence alone is enough to support a finding of more than minimal planning. *United States v. Callaway,* 943 F.2d 29, 31 (8th Cir.1991). Moreover, the district court noted that the record contained evidence that Sheahan actively worked with Vogt to avoid detection of their activity. We conclude that the district court committed no error in find-ing that Sheahan's offense involved more than minimal planning.

### IV.

The district court committed no error in determining Sheahan's offense level for sentencing. Accordingly, we affirm. Sheahan's motion for release pending appeal is denied as moot.

HEANEY, Senior Circuit Judge, dissenting.

I respectfully dissent. This case is yet another example of how the sentencing guidelines as currently construed result in fundamental unfairness to defendants and unnecessary appeals.

As the majority points out, Michael Sheahan was initially charged in a ten-count indictment. After lengthy negotiations, nine of the ten counts were dismissed pursuant to a written stipulation between the parties. The nine dismissed counts all related to a charge that Sheahan willfully and knowingly conspired with the president of the Mercantile Bank, Larry Vogt, to defraud the bank of more than $350,000. Count X related to three insufficient funds checks written on the Mark Twain Bank.

After the stipulation was signed, Sheahan changed his plea to guilty of Count X. At the change of plea hearing, Sheahan was told that "[t]he offense set forth in Count X carries a maximum sentence of imprisonment of twenty years." Change of Plea Tr. at 12. He was further told that the probation office would prepare a report, he would have the right to challenge any information in the report, and he had the right to appeal any sentence imposed. Sheahan was asked to describe his conduct with respect to count X, which he did in some detail. He stated that the amount involved was $110,440. The government then made a lengthy statement describing its version of the entire course of conduct, including information that related to the dismissed counts. The court then said:

---

6. Sheahan argues that the district court erred in considering the evidence from counts I through IX as "relevant conduct" in making its determination of more than minimal planning. The district court committed no error in looking to that evidence. *See United States v. Starr,* 986 F.2d 281, 282 (8th Cir.1993) (in deciding base offense level and specific offense characteristics a sentencing court considers *all relevant conduct*).

I understand what has been stipulated to and I understand that Mr. Sheahan's plea relates to only one of the Counts in this Indictment and that some of the other information that Mr. Reap [the prosecutor] is relating may not have application to the charge to which he's pleading guilty, but some of the other charges, if we were to proceed to trial on this case,—I can separate the two and *I just want you all to understand that I am considering the plea of guilty only as to Count X and my purpose is to make sure that Mr. Sheahan is in fact pleading guilty to that offense and that the facts are there that support the plea to Count X.*

*Id.* at 21 (emphasis added). The court went on to state:

I should tell you this[,] Mr. Sheahan, I had a meeting yesterday with Mr. Reap and Mr. Morse [Sheahan's attorney] and Mr. Donning, who I understand represented you in some civil matters, and I understand that you are naturally concerned about what your sentence is going to be in this case. As you know, no one,—I can't promise you, I can't tell you what I'm going to do in the future as far as your sentence. It may be that you would be eligible for probation for this charge or it may be that I find that it's appropriate that a sentence of imprisonment be imposed. Certainly if that happens, if it turns out that the sentence is one to which you disagree or are not anticipating, then you will not be permitted to withdraw your,—you will not have an absolute right, I'll put it that way, to withdraw your guilty plea, alright? Let me be more clear. If a sentence of imprisonment is imposed, say as opposed to probation, at that time, you or your lawyer may file a motion requesting that you be allowed to withdraw your guilty plea. However, there is no guarantee that I will grant that motion and there-

by allow you to withdraw your guilty plea, do you understand that?
*Id.* at 26–27.

Sheahan was not told at the change of plea hearing that his sentence would be based, at least in part, on conduct alleged in the first nine counts of the indictment. Nor was this fact set forth in the stipulation leading to the change of plea. It can be argued that both Sheahan and his attorney were aware of this possibility, but in my view, that is not sufficient. There is no reason why the district court in this case and others similar to it should not fully advise a defendant that conduct alleged in dismissed counts, if established by a preponderance of the evidence, *must* be considered by the court in imposing a sentence.[1] Furthermore, the time to resolve disputed issues as to relevant conduct is at the time of the plea.

In nearly all cases, sentencing data with respect to relevant conduct is just as available at the time of the guilty plea as at the time of sentencing. A defendant has a right to know before his plea what the consequences of that act will be. At the very least he should be told explicitly that conduct alleged in the dismissed counts will or will not be used in determining his sentence. It is a complete waste of the trial court's time to tell the defendant the maximum statutory sentence for the count to which he has pleaded guilty when that maximum has no significance under the current sentencing guidelines system.

If Sheahan had been explicitly told that the conduct alleged in the dismissed counts would be a major factor in determining the length of time he would serve, he may or may not have pleaded guilty. In either event, he would have been treated more fairly and an appeal might have been avoided. Under the circumstances of this case, I believe that this matter should be remanded to the district court, and the defendant should be given an opportunity to withdraw his guilty plea if he desires to do so.

---

1. I recognize that this court has held that acts or quantities alleged in dismissed counts can be used in calculating the base offense level of a defendant where they were a part of the same course of conduct or common scheme or plan as the count of conviction. *See, e.g., United States v.*

*Streeter,* 907 F.2d 781, 791 (8th Cir.1990). This holding does not excuse the failure to so advise a defendant at the time a plea of guilty is received. My personal view continues to be that the holding denies defendants due process, but I am bound by our decisions on the point.

I turn next to the issue discussed by the majority. First, assuming that the dismissed counts can be considered relevant conduct for sentencing purposes, did the district court err in finding that Sheahan's conduct with respect to the dismissed counts was criminal? The district court simply found that Sheahan knew that his accounts at Mercantile Bank were closed. This finding was essentially based on the testimony of Drew Armstrong, a special agent of the FBI. He testified that the bank's board of directors had ordered Vogt, the president of the bank, to close Sheahan's two accounts and that the accounts had been closed pursuant to that order. Yet the bank continued to honor checks written by Sheahan and did this over a period of fourteen months. In each instance Vogt would convert the check into a loan and increase Sheahan's debt to the bank. At the sentencing hearing the following colloquy ensued between Mr. Reap, the prosecutor, and Agent Armstrong:

Q. Okay. You interviewed Mr. Sheahan, did you not?

A. Yes.

Q. And did Mr. Sheahan indicate to you that he knew Mr. Vogt was doing this?

A. I can't remember. I'd have to look at the report of the interview of Mr. Sheahan. I can't remember whether he was aware of that or not.

Q. If I showed you your FBI interview, would it refresh your memory?

A. Yes.

Q. Why don't you look on page two, but look through the entire report if you wish.

A. According to the interview, Mr. Sheahan did know that and now I remembered he said that that was something he thought—he didn't think that was out of the ordinary. He thought Mr. Vogt was doing that so he'd have more control over the account.[2]

Sent.Tr. (Nov. 16, 1993) at 31. The district court accepted this testimony, and so do I, but it certainly fails to prove by a preponderance of the evidence that Sheahan knew that he was participating in an illegal scheme. At most it establishes that he knew these accounts were closed, not that his check writing was illegal.

Second, assuming Sheahan's conduct was illegal, the question remains, what was the loss to the bank? The district court determined the loss from the conduct alleged in the dismissed counts to be $338,738.50. It based its decision on the testimony of bank officials that the bank had written off this amount: "the debt of $338,000 was charged off, that was based on the bank's belief that this loan was not collectable." Sent.Tr. (Nov. 17–18, 1993) at 244, 271, 351. The fact is, however, that the $338,000 may not, and probably does not, represent the loss to the bank. It is very probable that the loss was substantially less than that. We do not know how much less because the sentencing court refused to receive testimony that would have tended to show that the bank suffered no loss at all. The undisputed fact is that Sheahan had substantial claims against the bank, and the bank had claims against Sheahan. Ultimately the parties stipulated to settle all lawsuits. At the sentencing hearing Sheahan's counsel called as an expert witness David Danis, the attorney who represented Sheahan in settling the civil claims. At that time the following colloquy occurred:

Q. [By Mr. Morse] Mr. Danis, you testified you negotiated the settlement on the lawsuit between Mr. Sheahan and Mercantile Bank.

A. Yes.

Q. And in your negotiation of that settlement, did you analyze what rights or what claims or the value of those claims that you were recommending your client give up in exchange for a release from Mercantile Bank?

A. Yes.

. . . .

Q. And what did your analysis show?

MR. REAP: I'm going to object to the relevance.

Id. at 419–20. The court sustained the government's objection. I believe the sentencing court erred in so doing.

2. The FBI interview was not made a part of the record.

In imposing the sentence on Sheahan, the court stated:

> Under the sentencing guidelines, the amount of loss in fraud cases like this is either the amount that the defendant intended to inflict on the victim, or the actual loss resulting from the defendant's fraudulent conduct, whichever is greater.
>
> In this case, the Court finds that there was an actual loss of $30,000 with respect to Mr. Fuhrer, and with respect to the bank there was an actual loss of $338,738.50, and that represents the amount that was left outstanding after the loans were called. This was the amount that the bank charged off after determining that that amount was uncollectable.
>
> Consequently, the Court finds that the actual loss in this case is more than $350,000, although it is not more than $500,000, as the presentence report reflects.
>
> Although a lot of the evidence that was presented related to the issue of the amount of loss that the defendant intended to inflict, I don't believe it's necessary to determine that, because there is evidence of actual loss that was sustained by the victims, and I believe that Mr. Fuhrer is— Mr. Fuhrer and Mercantile Bank are victims, and there is evidence of actual loss that they sustained that results from the defendant's fraudulent conduct.

Sent.Tr. (Nov. 19, 1993) at 13–14.

As the majority points out, the guidelines permit a court to sentence on the basis of the intended loss or the actual loss, whichever is greater. Here the district court sentenced Sheahan on the basis of the actual loss, obviously because there was no evidence as to the intended loss. Thus, we must review its action on the basis that it decided the case. This being so, we have no alternative but to remand for resentencing with direction to the district court to determine the actual loss after hearing Sheahan's evidence on that issue.

In summary, I dissent because I believe that the district court should not consider evidence concerning possible loss arising out of conduct alleged in the dismissed counts, and that the district court's findings on Sheahan's culpability and the amount of the bank's loss are clearly erroneous.