# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 08-3957

———————

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Plaintiff - Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of Minnesota. |
| Richard Allen Lange, | * | |
| | * | |
| Defendant - Appellant. | * | |

———————

Submitted: October 23, 2009
Filed: January 27, 2010

———————

Before LOKEN, Chief Judge, MURPHY and MELLOY, Circuit Judges.

———————

LOKEN, Chief Judge.

Richard Allen Lange was indicted on 55 counts of embezzlement, bank fraud, money laundering, and filing false tax returns. He pleaded guilty to one count of embezzlement by a credit union employee in violation of 18 U.S.C. § 657 -- diverting $11,000 of credit union funds to his personal account -- and one count of filing a false tax return in violation of 26 U.S.C. § 7206(1). At sentencing, the district court[1] found that Lange's relevant criminal conduct resulted in a total loss of $249,691.01 to First Community Credit Union of Columbia Heights, Minnesota (Credit Union). This

---

[1]The HONORABLE PAUL A. MAGNUSON, United States District Judge for the District of Minnesota.

amount of theft loss increased Lange's offense level by 12 levels, see U.S.S.G. § 2B1.1(b)(1)(G), resulting in an advisory guidelines sentencing range of 27 to 33 months in prison. The court granted a downward variance, sentenced Lange to 21 months in prison, and ordered him to pay restitution of $249,691.01. Lange appeals, arguing that the court erred by refusing to reduce the loss and restitution amounts by the value of commissions that he earned selling motor vehicles for the Credit Union. Reviewing the district court's loss determinations for clear error, we affirm. See United States v. Boesen, 541 F.3d 838, 850-51 (8th Cir. 2008) (standard of review).

Lange was president of the Credit Union for twenty six years. As president, he established the salaries of other Credit Union officers and employees. But Lange's annual salary, which exceeded $100,000 in 2004, was established and approved by the Credit Union's Board of Directors. In 1999, Lange began embezzling from the Credit Union, diverting funds to personal and family accounts in a variety of transactions. After irregularities were discovered, the Board forced Lange to resign in 2004. By then, he had obtained more than $250,000 in Credit Union funds over and above his annual salary, yet that salary was the only income he reported on his federal income tax returns. This prosecution followed.

After Lange pleaded guilty to one count of the 55-count indictment, the district court held an evidentiary sentencing hearing to consider Lange's fact-intensive objections to the PSR's recommendation that relevant conduct for sentencing and restitution purposes included $293,781.88 in total losses to the Credit Union. The district court upheld some of the objections, reducing the amount of theft loss and restitution to $249,691.01. However, the court rejected Lange's contention that theft loss and restitution should be reduced by commissions he earned on car sales by the Credit Union's First Fleet Services division. Lange's appeal focuses on those issues.

Lange testified that, in the mid-1990's, to increase its portfolio of car loans, the Credit Union "teamed up" with LMG, a car leasing company. LMG provided a sales

representative, Daniel Mundt, and leased to Credit Union members more than three hundred vehicles acquired by LMG with Credit Union loans. By 1999, this loan portfolio was in jeopardy because the residual value of the vehicles after lease expiration was now less than the loan balances. To reduce or eliminate these potential loan losses, the Credit Union established the First Fleet Services program to sell previously leased vehicles to its members.

Under this program, the Credit Union sold new and used cars to members who financed the purchases with Credit Union car loans. Lange testified that the sales price equaled the Credit Union's costs to acquire, refurbish, and repair a car, "and then our commissions were placed on top." For members, this resulted in a less-than-retail purchase price. For the Credit Union, it produced a portfolio of fully collateralized member loans. To make the program functional, Daniel Mundt left LMG and began selling cars to Credit Union members as a First Fleet Services commission salesman. However, during 2003 and 2004, Mundt suffered from serious illnesses that severely reduced his ability to work. Lange covered for Mundt's absence by hiring part-time sales employees on a commission basis and by assuming much of the car sales function himself. Lange testified that First Fleet Services established separate commission accounts for Mundt and for Lange. Board members were aware of the car sales, and some bought cars from First Fleet Services. But the Board was not asked to approve, and did not approve, paying Lange additional compensation for his efforts with the First Fleet Services division.

To prove the embezzlement losses set forth in the PSR, the government introduced through an IRS Special Agent its Exhibit 1, which listed more than one hundred transactions between 1999 and 2004 in which Credit Union funds totaling $293,781.88 were used to pay for Lange's personal expenditures, such as buying real estate, paying property taxes, and buying a car and a lawn mower, or were deposited into Lange's personal accounts. Of the total amount listed, over $100,000 was transferred out of First Fleet Services accounts. Lange testified that the First Fleet

Services transfers totaled approximately $155,000 and were commission payments to which he was entitled, like the sales commissions paid to Mundt and the part-time car salesmen. Lange introduced as his Exhibit 1 an annual summary of the Credit Union's total income, its "First Fleet Sales Income," and the commissions paid to Mundt, Lange, and others for the years 2000-2008.

1. On appeal, Lange argues that the Credit Union's loss for sentencing and restitution purposes may not include sales commissions he earned after he "took over Mr. Mundt's responsibilities with the . . . implicit approval of the board." It is an interesting theory that might have merit, at least as to the issue of restitution. But the record facts do not support the theory. Lange testified that Mundt was sidelined by illness in 2003 and 2004. Yet Lange's Exhibit 1 reflects that First Fleet Services paid him "commissions" in excess of $85,000 in 2001 and 2002, in addition to $119,000 in commissions paid to Mundt. Thus, it is apparent Lange failed to prove that his "commissions" were bona fide sales commissions. Rather, they were amounts Lange added to the sales price -- what Lange referred to as "commissions . . . placed on top" -- that he then put into his First Fleet Services "commission" account and transferred to his personal use as needed. In other words, Lange embezzled the Credit Union's profit on car sales, knowing that the Credit Union would earn additional profit on the car loans that would discourage any inquiry into this non-banking side of the business. The true nature of Lange's actions with First Fleet Services funds was graphically revealed near the end of his cross examination at the sentencing hearing:

> Q. And you would agree that your salary and compensation was supposed to be approved by the Board, right?
>
> A. The Credit Union portion of it, yes, sir.
>
>     \*    \*    \*    \*    \*
>
> Q. You are saying they did not have to approve whatever you got out of First Fleet, correct?

* * * * *

A. That is correct. As I said, they did not set prices on the cars, they did not set the work to be done, they did not set the hours to keep. They [set] no procedures, policies or guidelines regarding First Fleet.

* * * * *

Q. So, you were using the business of the Credit Union to make money for yourself?

A. Yes, sir.

Embezzling one-half of an employer's profits on a transaction is still embezzling, and amounts embezzled in this fashion are properly includible for both theft loss and restitution purposes. As Lange at sentencing did not tie any transfers of First Fleet Services funds listed on government Exhibit 1 to specific cars he sold, and presented no evidence as to the amount of sales commissions paid to Mundt and the other salesmen on cars they sold, the district court properly rejected Lange's sales commissions theory for failure of proof.

2. Lange further argues that the district court misapplied the advisory theft loss guideline because the commissions he earned on car sales were not relevant conduct. We disagree. Lange pleaded guilty to one count of an indictment charging him with fifty-five-counts of embezzlement. Embezzlement is an offense for which § 3D1.2(d) of the Guidelines requires grouping of multiple counts. For such offenses, relevant conduct includes losses from acts and omissions of the defendant that "were part of the same course of conduct or common scheme or plan as the offense of conviction." § 1B1.3(a)(2). Offenses are part of the same scheme or plan when they are "substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar *modus operandi*." § 1B1.3, comment. (n.9(A)). Offenses are part of "the same course of conduct" when

they are part of an "ongoing series of offenses," a determination that turns on the similarity, regularity, and time interval of the offenses. Id. at n.9(B). We review these fact determinations for clear error. United States v. Sheahan, 31 F.3d 595, 599 (8th Cir. 1994).

Over a five-year period, Lange secretly diverted substantial Credit Union funds to his personal use in a series of diverse, undisclosed transfers that included the $11,000 transaction to which he pleaded guilty. The embezzlements had a common purpose, a common victim, and a common *modus operandi*, and they occurred regularly over a relatively short period of time. Thus, the district court did not err in finding that all the embezzled funds resulted from relevant conduct and should be included in the amount of loss under § 2B1.1(b)(1). See Sheahan, 31 F.3d at 599-600; United States v. Reetz, 18 F.3d 595, 598 (8th Cir. 1994). As Lange made no disclosure that he was paying himself commissions on car sales, and failed to prove these payments were legitimate sales commissions, as opposed to embezzled profits, we reject the assertion that the transfers of funds from First Fleet Services accounts were not part of the Credit Union's theft losses. We likewise reject as without merit the contention that the First Fleet Services "commission" payments were not relevant conduct because the government failed to prove they were "attributable to the defendant's 'criminal conduct,'" as opposed to a civil wrong. Sheahan, 31 F.3d at 600. Embezzling a credit union's profits violates 18 U.S.C. § 657.

3. The theft loss guideline provides that the amount of loss should be reduced by "the fair market value of . . . the services rendered, by the defendant . . . to the victim before the offense was detected." § 2B1.1, comment. (n. 3(E)(i)). Relying on this provision, Lange argues that, even if he was not entitled to take commissions on car sales without Board approval, the amount of loss caused by his relevant criminal conduct must be offset by the Credit Union's profits on loans that resulted from those car-sale transactions.

The argument is contrary to the plain meaning of the offset provision. Lange seeks credit for the profits made on Credit Union car loans, not for the fair market value of his services to the First Fleet Services program. Not surprisingly, the Credit Union's loan profits exceeded the commissions paid on car sales. Thus, the rule Lange urges would distort or even obliterate the basic Guidelines principle that the punishment for theft offenses should increase with the amount of loss caused by the criminal conduct. See United States v. Johnson, 993 F.2d 1358, 1359 (8th Cir. 1993).

Lange cites no authority for the astonishing proposition that an employee is entitled to this kind of credit if the employer profited from business transactions conducted by the employee while embezzling. "The commentary to the guidelines provides that the court should apply a credit where the defendant returns the very money or property taken as part of the fraud," not when the victim receives "*other* benefits . . . that do not correlate directly with the amounts [obtained] as part of the fraud." United States v. Radtke, 415 F.3d 826, 842 (8th Cir. 2005) (emphasis in original). Lange is not entitled to reduce the amount of theft loss by the Credit Union's profits on car loans. Cf. United States v. Blevins, 542 F.3d 1200, 1203 (8th Cir. 2008) (denying credit against tax loss under § 2T1.1(c)(1) for unclaimed deductions unrelated to the theft or fraud), cert. denied, 129 S. Ct. 1024 (2009).

4. Finally, Lange argues that the district court erred by including his First Fleet Services "commissions" in the amount of victim restitution he is now required to pay under the Mandatory Victims Restitution Act (MVRA). 18 U.S.C. §§ 3663A(a)(1), (c)(1); see U.S.S.G. § 5E1.1(a). Restitution may be ordered "for criminal conduct that is part of a broad scheme to defraud, even if the defendant is not convicted for each fraudulent act in the scheme." United States v. DeRosier, 501 F.3d 888, 897 (8th Cir. 2007).

The statute provides that the court shall award as restitution "the full amount" of a victim's losses. 18 U.S.C. § 3664(f)(1)(A). "Congress intended that restitution

be a compensatory remedy from the victim's perspective." United v. Petruk, 484 F.3d 1035, 1038 (8th Cir. 2007). Therefore, restitution is limited to "the victim's provable actual loss." United States v. Chalupnik, 514 F.3d 748, 754 (8th Cir. 2008). We review a finding of the amount of loss for clear error; the government has the burden of proof on this issue. Id. at 752. Although the gross amounts of theft loss for sentencing purposes and victim loss for restitution purposes are often calculated in the same manner, as in this case, the two determinations serve different purposes and thus may differ depending on the relevant facts. See United States v. Stennis-Williams, 557 F.3d 927, 928 (8th Cir. 2009) (affirming $238,340 in fraud loss and only $56,134 in restitution).

In this case, Lange took $249,691.01 without Board approval. In the district court, he did not request a separate finding on the restitution loss issue. A specific finding that Lange paid himself the same sales commissions on cars he sold as the sales commissions paid Mundt on cars he sold might have warranted a finding that the Credit Union did not suffer actual loss to the extent of Lange's sales commissions. But as we have explained, Lange's testimony and summary exhibit (i) established that funds placed in his First Fleet Services "commission" account were not limited to sales commissions on cars he sold, and (ii) failed to establish whether there was a standard First Fleet Services sales commission and, if so, how many cars Lange personally sold on which no sales commission was otherwise paid. In these circumstances, Lange failed to refute the proof that all funds he withdrew without Board approval, including funds transferred from First Fleet Services accounts, were part of the total victim loss caused by his embezzlement scheme.

The judgment of the district court is affirmed.

_____