In the
United States Court of Appeals
For the Seventh Circuit

No. 01-1837

United States of America,

Plaintiff-Appellee,

v.

Ronald T. Schaefer,

Defendant-Appellant.

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. IP99-CR-109-01 D/F--S. Hugh Dillin, Judge.

Argued October 23, 2001--Decided May 28, 2002


   Before Harlington Wood, Jr., Cudahy, and
Kanne, Circuit Judges.

   Cudahy, Circuit Judge.  A jury convicted
Ronald Schaefer of three counts of mail
fraud and two counts of wire fraud, 18
U.S.C. sec.sec. 1341, 1343, arising from
the sale of Walt Disney animation art.
One count of wire fraud was subsequently
thrown out by the district court. The
convictions carry a six (6) Base Offense
Level under U.S.S.G. sec. 2F1.1(a)
(2000). The district court adopted the
Pre-Sentence Report, which prescribed
several upward adjustments, and sentenced
Schaefer to 37 months on each count, to
be served concurrently. Schaefer now
appeals, claiming that the district judge
improperly calculated the amount of the
financial loss under sec. 2F1.1(b)(1).
Because the district court did not make
specific findings of fact that would
allow us to conclude with confidence that
the relevant conduct relied upon to make
the sec. 2F1.1(b)(1) calculation of loss
consisted of unlawful conduct, we vacate
and remand for further proceedings.

I.

   On August 25, 1999, a federal grand jury
indicted Ronald Schaefer on eight counts
of mail fraud and six counts of wire
fraud, in violation of 18 U.S.C. sec.sec.
1341, 1343. The alleged crimes occurred
through Schaefer's business activities as
an art dealer, though he often presented

himself to his customers as a collector who did not derive his livelihood from the sale of art. Schaefer's specialty was animation art associated with the production and promotion of various Walt Disney movies. At issue in all of the charges are "cels," which are painted drawings of popular cartoon characters on clear plastic or acetates. The most valuable of these for collectors are "production cels." These pieces are one-of-a-kind artwork that are photographed and used as actual frames in an animation film. There are various other categories of cels, such as limited edition, publicity and sericels, which command less money than production cels as collectibles. Whether the cels are matted and framed may also affect their value.

Because the true market value of his wares varied according to their specific characteristics, Schaefer made it a habit to be purposefully ambiguous about the proper classification of his cels, often referring to publicity cels as "original hand-painted cels." He also boasted about the windfalls they would generate for their buyers as investments. On some occasions, he actually reduced to writing claims that certain publicity or counterfeit cels were production cels. Moreover, he often resorted to the ruse that he was selling art from his dead mother's estate at below-market prices that were mandated by her will, a story that was found to be a total fabrication at trial. Schaefer's deceptive business practices eventually included a scheme that involved an Indianapolis school teacher, Greg Shelton, who created cels depicting Mickey Mouse drawing a picture of Walt Disney. Schaefer portrayed Shelton to his customers as a former Disney animator and persuaded Shelton to author a letter that falsely touted the distribution and value of these paintings.

Eventually, Schaefer's sharp business practices attracted the attention of federal investigators, including the Federal Trade Commission (FTC) and the Indianapolis office of the FBI. Conversations recorded by undercover agents revealed additional lies and misrepresentations by Schaefer. Federal authorities subsequently seized Schaefer's art inventory. In turn, Schaefer sought relief through an action filed under the Federal Tort Claims Act.

Although Schaefer has often presented himself as a private collector, or as a faithful son discharging duties for his dead mother's estate, he submitted documents to federal officials as evidence that selling art was his "business" and that he earned between $5,000 and $10,000 per month through this activity. These figures were relied on by the government in making the sec. 2F1.1(b)(1) loss calculation, which was included in the Pre-Sentence Report (PSR) and later adopted by the district court.

The present case is not Schaefer's first run-in with the law. In 1992, the FTC filed a complaint against Schaefer and others, alleging that they engaged in deceptive practices in the promotion and sale of collectibles. The Final Judgment and Order for Permanent Injunction arising out of those proceedings prohibited Schaefer from engaging in deceptive practices in the sale of "investment offerings," including animation art. See Federal Trade Commission v. World Wide Classics, Inc., Civ. No. 92-3363TJH (EEX), at 4-6 (C.D. Cal., Dec. 15, 1993) (hereinafter the "1993 Order"). The 1993 Order also required that Schaefer post a $200,000 bond before engaging in the "business of telemarketing," which was broadly defined as any business that employed telephone presentations, "either exclusively or in conjunction with the use of the mails or any commercial parcel delivery service."

In the current action, Schaefer was indicted on charges of federal mail and wire fraud. Although Schaefer was released on his own recognizance, his pretrial release stipulated that he could not travel outside the Southern District of Indiana. On December 22, 1999, the U.S. Parole and Probation Office filed a Notice of Violation of Order Setting Release Conditions, alleging that Schaefer had violated the terms of his release. In fact, Schaefer had traveled to Nashville, Tennessee and sold an animation cel for $27,000. In addition, Schaefer had also contacted other potential customers and advised them of the dates he planned to be in their area. On January 4, 2000, a federal magistrate judge ruled that Schaefer had violated the terms of his release and further restricted Schaefer's ability to travel. Schaefer then made a motion to the court

requesting that the new pretrial terms be modified in order to permit him to make artwork sales though reputable gallery and auction houses. After another hearing on February 9, 2000, the magistrate judge denied Schaefer's motion. The magistrate judge also noted the likelihood that Schaefer had lied under oath during the earlier January 4, 2000 proceedings.

At the subsequent criminal trial, Schaefer was convicted on five counts of mail and wire fraud and acquitted on nine others. One count of conviction was eventually vacated by the district court for a possible retrial because there was some reason to believe that the government had improperly withheld exculpatory evidence in violation of Brady v. Maryland, 373 U.S. 83 (1963). Of the four remaining counts, both mail and wire fraud qualify as a six (6) Base Offense Level under U.S.S.G. sec. 2F1.1 (1997)./1 The PSR recommended a two (2) level increase for "more than minimal planning," see sec. 2F1.1(b)(2)(A); a two (2) level increase for violation of a judicial order, see sec. 2F1.1(b)(3)(B); a two (2) level increase for obstruction of justice, see sec. 3C1.1; and an eight (8) level increase for a total loss to victims in excess of $200,000, see sec. 2F1.1(b)(1)(I). The specific loss calculation provided in the PSR is $231,000, which was based on a purportedly representative sample of Schaefer's business activities that was then extrapolated over a five-year period. The district court adopted the PSR recommendations and sentenced Schaefer to thirty-seven months of incarceration. The court also ordered Schaefer to pay restitution in the amount of $41,574.

On a motion for reconsideration, Schaefer requested that the district court substantially reduce its loss calculation. Although Schaefer submitted a verified statement, which was offered to rebut the government claims that Schaefer knowingly deceived a large number of his customers, the district court ruled that Schaefer's past courtroom testimony demonstrated that he was not a credible witness. The district court's sentencing order did not, however, include any specific findings that Schaefer, under a more lenient preponderance of evidence standard,

committed most or all of the crimes charged in the indictment, or was guilty of other uncharged criminal conduct. Schaefer now appeals only from the $231,000 calculation of loss. Schaefer contends that the maximum loss stemming from the crimes of which he was convicted amounts to $1,875. This relatively small sum would not warrant any increase from the Base Offense Level. Under Schaefer's method of calculation, he would receive a six to twelve month sentence.

II.

The sole issue in this case is whether the district court erred in adopting the loss calculation of the PSR. The meaning of "loss" under sec. 2F1.1(b)(1) presents a question of law that is subject to de novo review. See United States v. Lopez, 222 F.3d 428, 436 (7th Cir. 2000). However, when analyzing the district court's calculation of loss caused by a defendant's fraudulent conduct, we review the calculations for clear error. See United States v. Vivit, 214 F.3d 908, 914 (7th Cir. 2000). Reversal is warranted only if the district court's loss calculation evokes a "definite and firm conviction that a mistake has been made." Id. (citing United States v. Strache, 202 F.3d 980, 984-85 (7th Cir. 2000)).

In order to support the calculation of a $231,000 loss from fraudulent activity, the PSR estimated that approximately 55 percent of Schaefer's $420,000 in business receipts from 1994 to 1999 was attributable to fraudulent sales practices. The 55 percent figure was derived from a sample of three sales made to customers in which 55 percent of the purchase price was attributable to false representations made by Schaefer. Since these sales provided approximately 20 percent of Schaefer's total receipts during this five-year period and were therefore asserted to be representative of the total, and since there was reason to believe that all of Schaefer's sales of animated art were shot through with deceptive business practices, the government reasoned that approximately 55 percent of all of Schaefer's receipts was attributable to an ongoing fraudulent scheme (i.e., 55% x $420,000 = $231,000)./2

The government maintains that the

entirety of Schaefer's artwork business represents "relevant conduct" under U.S.S.G. sec. 1B1.3(a)(2); it therefore argues that all of Schaefer's business receipts from 1994 to 1999 can be relied upon to support the $231,000 loss calculation. Under U.S.S.G. sec. 2F1.1(b)(1) of the sentencing guidelines, which deals with loss arising from fraud or deceit, this amount of financial harm warrants an eight-level increase. Under the prevailing case law of this circuit, a determination of relevant conduct is a finding of fact disturbed only if clearly erroneous. United States v. Ofcky, 222 F.3d 428, 438 (7th Cir. 2000), cert. denied, 121 S. Ct. 1601 (2001). In the present case, the PSR relies on an estimate of Schaefer's artwork transactions from 1994 to 1999 to calculate the sec. 2F1.1(b)(1) loss; the district court in turn adopted the recommendations of the PSR.

To attack the government's loss calculation, Schaefer makes three arguments on appeal. First, the government failed to prove that any of the losses incurred by Schaefer's customers were the result of criminal conduct, and therefore these losses cannot be considered relevant conduct under the Sentencing Guidelines. Second, the government improperly relied on unreliable hearsay to determine the scope of the relevant conduct that allegedly produced the $231,000 loss. Third, the government's methodology for extrapolating the loss was improper and grossly inflates the victim impact that can be fairly attributed to Schaefer. Each of these arguments will be addressed in order.

A.

Schaefer claims that "relevant conduct" under sec. 1B1.3, which specifies the conduct to be relied upon for sentencing determinations under the Guidelines, is necessarily limited to criminal conduct. To buttress this assertion, he cites case law from the Third, Fourth, Fifth, and Eight Circuits that have adopted this standard. See, e.g., United States v. Dove, 247 F.3d 152, 155 (4th Cir. 2001) (rejecting argument that "non-benign" rather than illegal conduct "may properly be considered as relevant conduct"); United States v. Peterson, 101 F.3d 375,

385 (5th Cir. 1996) ("For conduct to be considered 'relevant conduct' for the purpose of establishing one's offense level that conduct must be criminal."); United States v. Dickler, 64 F.3d 818, 830 (3d Cir. 1995) (agreeing with other circuits that relevant conduct must be criminal); United States v. Sheahan, 31 F.3d 595, 600 (8th Cir. 1994) (noting that government has burden of proving by a preponderance of evidence that defendant's conduct was criminal in nature before the district court can rely on it as relevant conduct). To further support his position, Schaefer points to the commentary to sec. 2F1.1, which states that "loss is the value of the money, property, or services unlawfully taken." sec. 2F1.1, comment. (n. 8) (emphasis added).

In deciding whether conduct under the Sentencing Guidelines to be relevant must be criminal or unlawful, we have not been much helped by the government. In its brief, the government has failed to cite, let alone distinguish, the cases on the criminal nature of relevant conduct from the Third, Fourth, Fifth, and Eighth Circuits. Instead, the government has attempted to justify the loss calculation by relying on generalized allegations of continuing fraud. While we agree with the government's comment that Schaefer's entire artwork business was "permeated with fraud," that characterization may have both civil and criminal aspects. As the cases cited by Schaefer make clear, only the latter category implicates sec. 1B1.3 of the Guidelines. The simplest and most direct way for the government to support its theory of the case is to point out how the specific elements of mail and wire fraud, which were the crimes specified in the fourteen-count indictment, were an integral part of Scheafer's artwork business from 1994 to 1999. It might also be possible to justify the $231,000 loss calculation by demonstrating that Schaefer's business practices routinely violated other criminal statutes (e.g., the criminal fraud provisions of Indiana law). However, the government has failed to direct this court, or the district court, to any additional statutory authority criminalizing Schaefer's conduct. Here, the government's briefing style is a bit long on evidence, but a bit short on analysis./3

In addition, the district court summarily adopted the PSR without making any specific findings with respect to the relevant conduct relied on to make the sec. 2F1.1(b)(1) loss calculation. Here, a fourteen-count indictment resulted in an acquittal on nine charges and a conviction on only four. One count was set aside for retrial because of a possible Brady violation. Although relevant conduct for sentencing purposes can certainly include uncharged conduct, see United States v. Smith, 218 F.3d 777, 782 (7th Cir. 2000), and even conduct that forms the basis of an acquittal, see United States v. Banks, 964 F.2d 687, 692 (7th Cir. 1992) (citing United States v. Fonner, 920 F.2d 1330, 1333 (7th Cir. 1990)), the district court must still make findings clearly identifying the relevant conduct and explaining how that conduct leads to a particular sentencing determination. The transparency of this process is especially important in a case such as this one, where the $231,000 loss calculation adopted by the district court is far in excess of the $1,875 loss that flows from the counts of conviction. While it is certainly possible that the PSR contains sufficient evidence of uncharged and acquitted conduct to support the much larger loss calculation, it is very difficult for us to sift through the contents of the PSR to determine whether there is a sufficient legal and factual basis for a particular criminal sentence. Although a district court's findings as to relevant conduct are reviewed for clear error, see Ofcky, 22 F.3d at 438, even such deference will not cure an absence of findings.

In attempting to distill what must be determined here, we turn first to the text of sec. 1B1.3, which is entitled "Relevant Conduct (Factors that Determine the Guideline Range)." Section sec. 1B1.3(a) defines relevant conduct for the purposes of Chapters Two and Three./4 Subsections (a)(1) and (a)(2) of sec. 1B1.3 refer to activity that is clearly criminal in nature./5 Subsection (a)(3) includes as relevant conduct all harm that flows from the criminal activities described in subsections (a)(1) and (a)(2). Finally, subsection (a)(4) defines as relevant conduct "any other information specified in the applicable guideline." In short, sec. 1B1.3(a)

explicates the fundamental rule that relevant conduct must be criminal in nature, though subsection (a)(4) indicates that each applicable guideline may also specify additional relevant factors.

Since sec. 2F1.1 is in Chapter Two, this framework necessarily applies to a sec. 2F1.1(b)(1) loss calculation. Therefore, in addition to crimes that were committed in connection with the offense of conviction, see sec. 1B1.3(a)(1), or criminal acts or omissions that were part of the same course of conduct or common scheme as the offense of conviction, see sec. 1B1.3(a)(2), a loss calculation under sec. 2F1.1(b)(1) also involves "the value of the money, property, or services unlawfully taken." sec. 2F1.1, comment. (n. 8). Arguably, there may be instances in which "unlawful" conduct is a slightly broader category than criminal conduct, but neither Schaefer nor the government has attempted to claim or explain such a distinction.

Although the government in this case has convincingly demonstrated that Schaefer's routine dealings were, at a minimum, disreputable and unethical, the plain terms of the Guidelines make clear that such a showing is not enough. For all of Schaefer's business receipts to be included in a sec. 2F1.1(b)(1) loss calculation, the government must demonstrate, by a preponderance of evidence, that all of Schaefer's business activities were unlawful. Moreover, if the loss calculation is not based entirely on the counts of conviction, the district court must make specific findings on the relevant conduct (i.e., unlawful conduct) on which it relies to make its sec. 2F1.1(b)(1) calculation of loss.

Our holding that relevant conduct under sec. 1B1.3 of the Guidelines is limited to criminal conduct is amply supported by the case law in other circuits. For example, in Petersen, supra, the Fifth Circuit vacated a sec. 2F1.1(b)(1) loss calculation in a securities fraud case because the district court "made no determination as to whether the defendant's conduct with regard to the $1.3 million loss to the ABFL was actually criminal conduct rather than a violation of the fiduciary agreement making the defendant civilly liable." 101

F.3d at 385. The Fifth Circuit expressed concern that if relevant conduct were not limited to criminal conduct, defendants could be more severely punished by "having their guideline range increased for activity which is not prohibited by law but merely morally distasteful or viewed as simply wrong by the sentencing court." Id.; accord United States v. Dove, 247 F.3d 152, 155 (4th Cir. 2001) (rejecting argument that "non-benign" conduct "may properly be considered as relevant conduct" and following Petersen).

Similarly, in Dickler, supra, the Third Circuit reviewed a sec. 2F1.1(b)(1) loss calculation that was based on a long-running scheme to submit false bids for the purchase of repossessed cars. The defendants had submitted false bids to the Resolution Trust Corporation (RTC), which had been appointed custodian of two failed banks. The defendants were subsequently charged with concealing assets from the RTC, in violation of 18 U.S.C. sec. 1032(2). However, this statute was not enacted until November 29, 1990. From 1985 to 1990, the defendants had been submitting false bids to the predecessor banks. Without citing any statutory basis to demonstrate that the defendant's pre-1990 conduct was unlawful, the government attempted to include at sentencing the 1985 to 1990 time period as relevant conduct. Although the Third Circuit observed that "it is highly likely that the defendants' conduct during the challenged period did violate some criminal statute," it determined that "[d]ue process requires that the defendants have fair notice of exactly why the government believes their conduct during this period was criminal and a fair opportunity to counter the government's case on that score." 64 F.3d at 831. It therefore remanded the matter to the district court with instructions to require the government to identify "the statute or statutes its relies upon and to identify the record evidence that satisfies each element of the offense proscribed." Id.

Finally, in Sheahan, supra, the Eighth Circuit upheld a sec. 2F1.1(b)(1) loss calculation in a case involving bank fraud despite the fact that a substantial portion of the total loss was attributed to nine criminal counts that had been

dismissed as part of the defendant's plea bargain. 31 F.3d at 600. The court emphasized that the dismissed counts "clearly alleged offenses that are subject to prosecution under 18 U.S.C. sec.sec. 1344 and 1346." Id. The sole remaining issue, therefore, was whether the government had demonstrated the unlawfulness of the defendant's relevant conduct by a preponderance of the evidence. The Eighth Circuit went on to rule that the government had met this burden. See id.

Limiting sec. 1B1.3 relevant conduct to criminal activity, with appropriate modifications based on specific provisions contained elsewhere in the Guidelines, can be easily reconciled with the single case in this circuit which has touched on the distinction between illegal and legal conduct for sentencing purposes. In United States v. Marvin, 28 F.3d 663 (7th Cir. 1994), the defendant in a wire fraud scheme argued that the district court erred when it refused to grant him a sec. 3E1.1 sentence reduction for acceptance of responsibility. After the defendant entered a guilty plea but before his sentence was imposed, the district court determined that the defendant had engaged in several acts of deceit, including renting a residence under a false name and writing checks from an overdrawn account, which were inconsistent with acceptance of responsibility. Id. at 665. On appeal, the defendant contended that this activity could not be relied upon for a sentencing determination because it could not be properly characterized as "illegal." Id. at 666. Relying on the commentary to sec. 3E1.1, we ruled:

A sentencing judge may properly consider any "conduct of the defendant that is inconsistent with such acceptance of responsibility" which would outweigh the defendant's earlier guilty pleas as a proxy for acceptance of responsibility. U.S.S.G. sec. 3E1.1, comment. (n. 3). Therefore, although possibly relevant, it is not necessary that the sentencing judge consider only illegal or criminal activity. The sentencing judge may consider other conduct which is inconsistent with the defendant's acceptance of responsibility.

Id. at 666.

Marvin is entirely consistent with the framework that we have discussed. The language of sec. 1B1.3 clearly limits relevant conduct, for the purposes of Chapters Two and Three sentencing determinations, to criminal conduct. However, an additional relevant criterion is "any other information specified in the application guideline." sec. 1B1(a)(4). Therefore, in Marvin, this court properly looked to the commentary to sec. 3E1.1 to determine the range of evidence, beyond sec. 1B1.3 relevant conduct, that could be considered in an acceptance of responsibility ruling. As a result, Marvin is distinguishable from the rulings by the Third, Fourth, Fifth, and Eight Circuits that have limited sec. 1B1.3 relevant conduct to criminal activities.

In the case now before us, the government has provided us with no basis for departing from the clear weight ofauthority. Under the circumstances, we must remand to the district court with instructions to require the government to identify the specific unlawful conduct relied upon to justify the sec. 2F1.1(b)(1) loss calculation. In addition, to justify the $231,000 loss calculation recommended by the PSR, the district court must make specific findings, based on a preponderance of evidence, that all of Schaeffer's artwork business from 1994 to 1999 constituted unlawful conduct.

B.

In this case, there is a significant gap between the loss that flows from the counts of conviction ($1,875) and the loss calculated by the PSR ($231,000), which was subsequently adopted by the district court. In order to support this much larger loss calculation, the government submitted a sworn affidavit from FBI Special Agent Robert Brouwer (Brouwer declaration), which provided a detailed summary of a lengthy joint investigation of Schaeffer conducted by the FBI, the Federal Trade Commission (FTC) and the Department of Justice (DOJ). The Brouwer declaration recounted the facts and circumstances surrounding a variety of attempted and completed artwork sales by Schaefer, including several transactions that did not form

the basis of the criminal indictment. Although the district court never made any explicit findings on relevant conduct, the order rejecting Schaefer's motion for reconsideration of the loss calculation ruled that it had relied, in part, on the Brouwer declaration. This document arguably provides the district court with a basis to expand the scope of Schaefer's relevant (unlawful) conduct beyond the counts of conviction.

Schaefer argues that the district court erred when it relied on the Brouwer declaration to adopt the loss calculation in the PSR. Schaefer states that some of the information in the declaration was based on evidence collected by other government investigators, which in turn was summarized by Brouwer. Schaefer asserts that this evidence constitutes highly unreliable "hearsay on hearsay" testimony. Although this case will be vacated and remanded to the district court for further proceedings, we will address the hearsay issue now because it is also relevant to a proper resolution of the loss calculation.

As a threshold matter, Schaefer correctly observes that hearsay testimony can be utilized for sentencing purposes if it is "reliable." United States v. Morrison, 207 F.3d 962, 967 (7th Cir. 2000). However, his underlying argument is flawed because the legal authorities he relies on to impugn Brouwer's declaration as unreliable hearsay are a series of Seventh Circuit cases in which the amount of drugs for sentencing purposes was adduced from the hearsay testimony of other criminal defendants who failed to testify at trial. See, e.g., United States v. Palmer, 248 F.3d 569, 571 (7th Cir. 2001) (rejecting hearsay statements made by individual two years after the alleged drug transaction; noting that no testimony was available at the sentencing hearing because the declarant cited his Fifth Amendment rights); United States v. Robinson, 164 F.3d 1068, 1071 (7th Cir. 1999) (rejecting hearsay statements made by another criminal defendant involved in the same drug transaction because statements were internally inconsistent and lacked "the kind of 'indicia of reliability' upon which a sentencing judge could comfortably rely").

In contrast, the information collected by Special Agent Brouwer was obtained from several of Schaefer's customers who did not testify at trial. In addition, many the transactions included in the Brouwer declaration did not serve as the basis for the fourteen-count federal indictment. Nonetheless, the examples of fraud and misrepresentation summarized by Brouwer were consistent with live testimony from other Schaefer customers that described Schaefer's modus operandi. The Brouwer declaration therefore further corroborated the overall picture of Schaefer's conduct that emerged at trial. Schaefer also claims that Brouwer relied on the work of other FBI agents in preparing his declaration, thus resulting in "hearsay on hearsay." Our review of Brouwer declaration suggests that Special Agent Brouwer conducted many of these interviews personally, and that during this process, the FBI was working closely with other investigators from the FTC and the DOJ./6 But Brouwer states the basis for his information in considerable detail, which conveys a strong impression of exhaustive and well-documented police work. Although the declaration does constitute hearsay, it nonetheless appears to have sufficient indicia of reliability to permit its use for sentencing purposes.

Schaefer's "hearsay on hearsay" argument also falters for lack of legal support. Schaefer has failed to direct this court to any legal authority which suggests that more than one layer of hearsay in an affidavit by a law enforcement agent summarizing the findings of a comprehensive investigation conducted by himself and other agents (1) precludes its use for sentencing purposes, or (2) is of dubious reliability and, therefore, should be weighed accordingly. Certainly, Schaefer's counsel had the opportunity to make the latter case. Brouwer was present during Schaefer's sentencing hearing. If Schaefer wanted to impeach Brouwer's methods of investigation or his truthfulness, Schaefer was free to put him on the stand, but he elected not to do so. Hence, we see no error in reliance on Special Agent Brouwer's statements.

Finally, Schaefer's Verified Statement, which was submitted to the district court for sentencing purposes, attacks the accuracy of the Brouwer declaration.

However, in denying Schaefer's motion for reconsideration of the sec. 2F1.1(b)(1) loss calculation, the district court specifically determined that Schaefer's Verified Statement could not be relied upon. Based on Schaefer's pretrial testimony and overwhelming evidence from the government that Schaefer committed perjury, the district court ruled that "the defendant is not a credible witness." In contrast, the district court noted that Special Agent Brouwer "testified at the trial of this cause, and is a credible witness." Assessing the credibility of witnesses is a matter uniquely within the province of the fact finder. Absent a showing of clear error, we will not reverse a district court on matters that hinge on the credibility of witnesses. See United States v. Lindsey, 123 F.3d 978, 980 (7th Cir. 1997). Schaefer's hearsay argument is therefore unavailing because it is inextricably en meshed with issues of credibility. On remand, the district court may rely on Brouwer's testimony and affidavit in making its loss calculation.

C.

Schaefer's last argument in challenging his sec. 2F1.1(b)(1) loss calculation is that the extrapolation method followed in the PSR is flawed to the point of being clearly erroneous. Part of this argument is essentially a rehash of the relevant conduct and hearsay issues we have already discussed. However, Schaefer adds the additional claim that the government's loss calculation failed to consider that the majority of Schaefer's artwork was sold at fair market value. Even if the value of this work had been misrepresented to his customers, Schaefer asserts that the district court erred in accepting the testimony of expert witness Lentz, who assigned a value of zero to many pieces of art despite the fact that they had been professionally matted and framed. Schaefer also points out that he was acquitted on nine out of fourteen counts of the indictment. Since these acquittals suggest that many of his artwork transactions were untainted by fraud, Schaeffer argues that a loss calculation based on all of his business receipts is over-inclusive and grossly inflates the total amount of the loss.

The primary defect in the district

court's loss calculation is that it failed to make explicit findings identifying with specificity the relevant unlawful conduct that allegedly caused the $231,000 loss. However, Schaefer's argument with respect to the actual mechanics of the loss calculation lacks merit. Since sentencing determinations, as opposed to criminal convictions, are made under the preponderance of evidence standard, see United States v. Gee, 226 F.3d 885, 898 (7th Cir. 2000) (citing United States v. Watts, 519 U.S. 148, 157 (1997)), the district court may consider uncharged conduct or even conduct that was acquitted. Moreover, the commentary to the Guidelines specifically addresses the use of estimates in making loss calculations:

For the purposes of subsection (b)(1), the loss need not be determined with precision. The court need only make a reasonable estimate of the loss, given the available information. This estimate, for example, may be based on the approximate number of victims and an estimate of the average loss to each victim, or on more general factors, such as the nature and duration of the fraud and the revenues generated by similar operations.

U.S.S.G. sec. 2F1.1(b)(1), comment. (n. 9). In this case, the $231,000 loss figure was determined by multiplying total business receipts during the last five years ($420,000) by 55 percent. The figure of 55 percent is derived from sales to three of Schaefer's customers that formed the basis for the indictment on multiple counts of wire and mail fraud. As discussed earlier, these three customers accounted for approximately 20 percent of Schaefer's total receipts from 1994 to 1999. If the district court concludes, under a preponderance of evidence standard, that all of Schaefer's artwork business was unlawful, this extrapolation method may not be unreasonable.

The sampling technique set forth in the PSR and adopted by the district court also finds support in the case law. In United States v. Austin, 54 F.3d 394, 402 (7th Cir. 1995), this court upheld a loss calculation for the sale of art forgeries despite the fact that government experts inspected only a fraction of the artwork

involved in the disputed sales. In Austin, a value of zero was imputed to every sale of art made by the defendant over a six-year period, since government experts determined that his current inventory was comprised entirely of counterfeits. We concluded that, even if the pieces Austin sold between 1984 and 1990 were not completely worthless, as the defendant maintained, $0 was the best estimate of their worth. See id.

Here, the loss calculation adopted by the district court was based on the apparently reasonable premise that 55 percent of Schaefer's business receipts were tainted with fraudulent misrepresentations. Although this sampling method did not "credit" Schaefer for the value of misrepresented artwork that had been matted and framed, the dec laration by expert witness Lentz concluded that "the frame and matting surrounding counterfeit or misrepresented cheap cels have no market value other than scrap value." In denying Schaefer's motion to reconsider the loss calculation, the district court cited both Lentz's testimony at trial and his declaration submitted during the sentencing proceeding to conclude that Lentz was a credible witness. As stated earlier, this court will not reverse a credibility finding by a district court absent a showing of clear error. See Lindsey, 123 F.3d at 980. Schaefer has not undermined Lentz's credibility in any way. Moreover, there is no basis for demanding that Schaefer be given full credit for the cost of matting and framing artwork, when the art itself has been misrepresented to the consumer. Cf. United States v. Saykhom, 186 F.3d 928, 947 (9th Cir. 1999) (observing that defendant should not be given credit for business services that were merely part of a fraudulent scheme).

Finally, Schaefer maintains that $1,875 is the proper loss calculation because this is the amount that can be attributed to the counts of conviction, and the nine acquittals cast doubt on Schaefer's overall culpability. However, the commentary to the Guidelines specifically states that the "offender's gain from committing the fraud is an alternative estimate that ordinarily will underestimate the loss." U.S.S.G. sec. 2F1.1(b)(1), comment. (n. 9) (emphasis

added). In the present case, if the district court determines by a preponderance of the evidence that all of Schaefer's transactions from 1994 to 1999 were tainted with unlawful conduct, there is ample evidence that a loss calculation limited to the counts of conviction would substantially understate the total loss to Schaefer's customers.

Finally, the district court may have been correct when it characterized its loss estimate as "conservative." The loss calculation did not include any "intended loss" that might be ascribed to Schaefer's entire $500,000 art inventory that was seized by government officials. See United States v. Strozier, 981 F.2d 281, 284-85 (7th Cir. 1992) (ruling that a loss calculation can be based on probable losses that would have occurred but for the intervention of law enforcement). The loss calculation also did not include any adjustment for the appreciation in value that Schaefer told his consumers they would enjoy because he was selling his artwork at below-market prices under the requirements of his dead mother's estate. As the district court correctly observed, such amounts can be considered in a sec. 2F1.1(b)(1) loss calculation. See United States v. Porter, 145 F.3d 897, 901 (7th Cir. 1998) (ruling that misrepresentations of a rate of return made in furtherance of fraudulent scheme can under some circumstances be included in a loss calculation). However, before the district court can rely on these additional approaches to justify its loss calculation, it must make specific findings as to how much of Schaefer's business was tainted by unlawfulness.

III.

The relevant conduct relied upon by the district court to make its loss calculation under sec. 2F1.1(b)(1) has not been adequately articulated and justified. Therefore, we VACATE and REMAND to the district court for further proceedings consistent with this opinion.

FOOTNOTES

/1 The district court adopted the findings and recommendations of the PSR. Paragraph 51 of the PSR states that its recommendations were based on the 1997 Guidelines Manual because the offenses

predated Nov. 1, 1998. According to the PSR, the 1998 edition contained a special offense enhancement that was unfavorable to the defendant. Although this provision is not specifically identified by the PSR or the district court, the version of sec. 2F1.1(b)(3) in effect at the time of Schaefer's sentencing authorized a new 2-level upward adjustment for an "offense committed through mass-marketing," which Schaefer may have been qualified for. In addition, the text of the obstruction of justice enhancement under sec. 3C1.1 was revised some time between the 1997 and the 2000 Guidelines Manual. Ordinarily, "a court imposes a sentence based upon the guidelines in effect as of the date of sentencing." United States v. Kosmel, 272 F.3d 501, 507 (7th Cir. 2001) (citing U.S.S.G. sec. 1B1.11(a); United States v. Hall, 212 F.3d 1016, 1022 (7th Cir. 2000)). In this case, the 2000 Guidelines Manual was in effect at the time of sentencing. However, ifapplying the current guidelines would violate the ex post facto clause of the Constitution, "the court shall use the Guidelines Manual in effect on the date that the offense of conviction was committed." sec. 1B1.11(b)(1); accord Kosmel, 272 F.3d at 507; United States v. Booker, 70 F.3d 488, 490 n.3 (7th Cir. 1995). The PSR appeared to flag a possible ex post facto problem and therefore relied on the 1997 Guidelines Manual. The district court then adopted the PSR. Because neither party has raised this issue on appeal, we will confine our review to the 1997 Guidelines. The loss calculation provision which is relevant to this appeal--sec. 2F1.1(b)(1)--is the same under both the 1997 and 2000 Guidelines Manual.

/2 The remaining 45 percent of each transaction would therefore represent fair market value of the goods sold.

/3 One sentence in the government's brief seems to suggest that the $230,000 loss calculation is appropriate because all of Schaefer's business dealings from 1994 to 1999 were in violation of the 1993 Order. Appellee's Br. at 35. However, premising Schaefer's loss calculation on the violation of the 1993 Order raises serious issues of double counting. See United States v. Parolin, 239 F.3d 922, 928 (7th Cir. 2001) ("'Double counting occurs when identical conduct is described in two different ways so that two different adjustment apply.'" (quoting United States v. Haines, 32 F.3d 290, 293 (7th Cir. 1994))). Schaefer has received a two-level enhancement under sec. 2F1.1(b)(4)(C) for violation of the 1993 Order, which he has not contested on appeal. In addition, the PSR states that the U.S. District Court for the Central District of California has issued an Order to Show Cause why Schaefer should not be held in criminal contempt of

the 1993 Order. A contempt trial was supposedly set for July 5, 2000. Because of the possible double-counting problem and the fact that the government did not adequately develop this argument in its brief, this court will not consider it as a basis for affirming the district court.

/4 Under the Sentencing Guidelines, the chapter is denoted by the first number, followed by a letter, which denotes the part. Thus, sec. 1B1.1 denotes chapter one, part B, subsection 1.1.

/5 For example, sec. 1B1.3(a)(1) states that relevant conduct includes "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant" that occurred "during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that act." If the character of the offense requires grouping of multiple counts, sec. 1B1.3(a)(2) includes as relevant conduct "all acts or omissions . . . that were part of the same course of conduct or common scheme or plan as the offense of conviction."

/6 Paragraph One of the Brouwer declaration reads in part: "I have worked with other FBI Agents, and officials from the Office of the United States Attorney, the Department of Justice, and the Federal Trade Commission . . . concerning the subject matter of this affidavit. This affidavit is based on my personal knowledge and information and belief."