# In the
# United States Court of Appeals
## For the Seventh Circuit

_____

No. 03-1189

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

RONALD T. SCHAEFER

*Defendant-Appellant.*

_____

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. IP 99-CR-109 D/F—**Sarah Evans Barker**, *Judge.*

_____

ARGUED JANUARY 5, 2004—DECIDED SEPTEMBER 13, 2004

_____

Before CUDAHY, POSNER and KANNE, *Circuit Judges.*

CUDAHY, *Circuit Judge.*

## I.

This is a successive appeal. The facts underlying Ronald Schaefer's conviction are set forth in our prior opinion, *United States v. Schaefer*, 291 F.3d 932 (7th Cir. 2002) (*Schaefer I*), and since they are not directly relevant to this appeal, we will not repeat them here. Suffice it to say that Schaefer was convicted by a jury in April 2000 of five counts of fraud in connection with the sale of Walt Disney anima-

tion cels, which are painted drawings of popular animated characters on clear plastic or acetates. One count of conviction was subsequently vacated by Judge S. Hugh Dillin, who was presiding over the case at the time, because the government improperly withheld potentially exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). (*See* 11/25/2002 Order at 4.) Judge Dillin sentenced Schaefer to 37 months' imprisonment in accordance with his determination that the total loss stemming from Schaefer's fraudulent activities (both charged and uncharged) was $231,000, resulting in an 8-level enhancement and a total offense level of 20, with a corresponding 1997 Sentencing Guidelines range of 33-41 months.

The $231,000 loss was calculated by applying the government's suggested multiplier of 55% to an estimate of the value of the artwork purchased by Schaefer's customers between 1994 and 1999—$420,000. The 55% multiplier was derived by determining the percentage of the total value of animation art Schaefer sold to three representative customers[1] that was attributable to fraud. In other words, only $38,500, or 45%, of the $84,249 that these three customers paid Schaefer was attributable to the actual market value of the artwork they purchased; the remainder of the price was attributable to Schaefer's fraudulent misrepresentations. (PSR at 33.[2]) The $420,000 figure is Schaefer's total income from the sale of animation art between 1994 and 1999 (*id.* at 30), which corresponds to the total amount purchasers paid Schaefer for animation artwork during that time. Judge Dillin, however, did not include specific factual findings in making his loss determination for sentencing purposes. On appeal, we held that conduct, to be relevant

---

[1] Schaefer's sales to these three customers represented more than 20% of Schaefer's total income from the sales of animation art.

[2] References to Schaefer's Presentence Investigation Report will be designated by "PSR at ___."

conduct, had to be unlawful. *Schaefer I*, 291 F.3d at 939-40. There were no findings that Schaefer's conduct had met this test. *Id.* at 945. However, we noted that the extrapolation/multiplier methodology was not itself inherently unreasonable. *Id.* at 944. We therefore vacated Schaefer's sentence and remanded the case, which was reassigned to Judge Barker,[3] for a determination of "how much of Schaefer's business was tainted by unlawfulness." *Id.* at 945. We suggested that the simplest way for the government to justify the $231,000 loss calculation would be by pointing out "how the specific elements of mail and wire fraud, which were the crimes specified in the fourteen-count indictment, were an integral part of Schaefer's artwork business from 1994 to 1999." *Id.* at 938. Alternatively, Schaefer's conduct could be shown to violate other criminal statutes (e.g., state criminal fraud provisions). *Id.*

Judge Barker reviewed the record and the parties' briefs and submissions and heard oral argument from the parties. She then found, by a preponderance of the evidence, that all of the charged conduct was criminal because it constituted mail or wire fraud; that all of Schaefer's uncharged conduct was equally criminal because Schaefer used the same methods and means throughout his dealings in animation art as he did with respect to the conduct charged; and that Schaefer's intentions and methods in dealing in animation art were part of an overall scheme to defraud. But despite concluding that all of Schaefer's conduct was unlawful, and in the face of our suggestion in *Schaefer I* that the 55% multiplier and extrapolation were reasonable ways to estimate the loss stemming from Schaefer's fraudulent conduct, Judge Barker found that the 55% multiplier was too speculative to allow losses to be calculated with particularity. (11/25/2002 Order at 9.) Therefore, she declined to

---

[3] Judge Dillin had relinquished his docket since imposing Schaefer's sentence.

use it in determining loss for the purpose of sentencing. (*Id.*) Instead, Judge Barker determined that the total loss from sales to the three representative victims that could be identified with particularity was $81,801. She then used $81,801 as the relevant conduct amount "because it is the calculation that the Court can most straightforwardly and accurately perform and document from the evidence and about which we have the most confidence in terms of a sum certain." (*Id.* at 8-9.) She then *sua sponte* added a 3-level upward departure to Schaefer's sentencing level because "the identifiable losses grossly and substantially understate the actual monetary losses resulting from Defendant's criminal behavior": *one* level because Schaefer's overall earnings of $420,000 during the period 1994-1999 were virtually all fraudulently generated; *one* level because of the extent of the *intended* loss as evidenced by the seizure of $500,000 in inventory; and *one* level because of the loss to purchasers from unrealized appreciation[4] in value. (*Id.* at 11-12.) The resulting sentencing range included the sentence of 37 months that Judge Dillin had ordered, and Judge Barker reimposed that sentence.

However, Judge Barker's sentencing methodology also gives Schaefer a whole new set of issues to appeal. He chips away at Judge Barker's determination that his victims suffered $81,801 in identifiable losses by arguing that that amount incorrectly includes uncharged transactions (half of which he alleges involved no fraud, despite the district court's conclusion to the contrary) as well as the loss attributable to Count Two, which had been vacated on

---

[4] In *Schaefer I*, we noted that Judge Dillin's loss calculation may have been conservative because it "did not include any adjustment for the appreciation in value that Schaefer told his consumers they would enjoy because he was selling his artwork at below market prices under the requirements of his dead mother's estate." 291 F.3d at 945.

*Brady* grounds. He also argues that the district court erred in departing upward three levels given Judge Barker's finding that it is "speculative" to claim that Schaefer's customers suffered more than $81,801 in losses, and because the Guidelines already took into account the circumstances cited for the departures. In the wake of the Supreme Court's decision in *Blakely v. Washington*, 124 S.Ct. 2531 (2004) and our application of its principles to the federal sentencing guidelines in *United States v. Booker*, 375 F.3d 508 (7th Cir. 2004), *cert. granted* 2004 WL 1713654 (U.S. Aug. 2, 2004), Schaefer filed a supplemental brief arguing that resentencing is required because in calculating his sentence, the district court relied on facts not found by a jury.

## II.

These days it should come as no surprise that our discussion commences with the Supreme Court's recent decision in *Blakely* and our reading of *Blakely* in *Booker*. As we recently observed, "the constitutional validity of the Guidelines is in doubt." *United States v. Shearer*, 2004 WL 1795085, at *3 (7th Cir. August 12, 2004). We continued:

> Under *Blakely* as interpreted in *Booker*, a defendant has the right to have a jury decide factual issues that will increase the defendant's sentence. As *Booker* holds, the Guidelines' contrary assertion that a district judge may make such factual determinations based upon the preponderance of the evidence runs afoul of the Sixth Amendment.

*Id.* In accordance with both *Booker* and *Shearer*, we must remand the present case to the district court for resentencing.

## III.

Although *Blakely* and *Booker* necessitate our remand of this case to the district court for resentencing, we will nonetheless address Schaefer's arguments under the Guidelines relating to the loss calculations and upward departures employed by the district court. We do so in the interest of judicial economy in the event that the Supreme Court may subsequently decide some other fate for the federal Guidelines than that indicated in *Booker*.

## A. Loss calculations

We review the district court's calculation of loss caused by a defendant's fraudulent conduct for clear error. *United States v. Sykes*, 357 F.3d 672, 675 (7th Cir. 2004); *Schaefer I*, 291 F.3d at 936-37. "To find clear error we must be persuaded that the sentencing court made a fundamental error which resulted in a complete miscarriage of justice." *United States v. Hatchett*, 31 F.3d 1411, 1423-24 (7th Cir. 1994). "Reversal is warranted only if the district court's loss calculation evokes a 'definite and firm conviction that a mistake has been made.'" *Schaefer I*, 291 F.3d at 937 (citations omitted).

On remand, Judge Barker reviewed the record and the parties' briefs and submissions and heard oral argument from the parties. She found, by a preponderance of the evidence, that all of the charged conduct (both counts of conviction and counts of acquittal) was criminal because it constituted mail or wire fraud. (11/25/2002 Order at 6-7.) She then found that all of Schaefer's uncharged conduct was also criminal because Schaefer used the same methods that he used with respect to the charged conduct. (*Id.* at 7.) She concluded that "the whole of Defendant's art selling business activities during the years 1994 through 1999 comprised a fraudulent scheme perpetrated by him against numerous customers/purchasers, virtually all of whom be-

came victims through Defendant's acts of mail and wire fraud." (*Id.* at 2.)

Judge Barker also noted that relevant conduct, to qualify as such, must be within the scope of the scheme to defraud. In that regard, she stated that "[t]he record leaves us entirely convinced that Defendant's intentions and methods in dealing in animation art were all of one fraudulent piece, advanced as part of an over-arching, all-inclusive scheme that affected every transaction he conducted." (*Id.* at 3.) The evidence supporting this conclusion was said to "evinc[e] a well-established, on-going, consistent pattern of misrepresentations and deceits told or written to customers that permeated and influenced virtually every transaction he conducted." (*Id.*) Thus, we find that Judge Barker correctly determined that all of Schaefer's conduct, including counts of conviction, counts of acquittal and uncharged conduct, was criminal in nature and properly constituted relevant conduct.

Judge Barker identified three categories of losses that she could calculate with particularity: (1) losses stemming from the counts of conviction; (2) losses stemming from the counts of acquittal; and (3) losses stemming from uncharged conduct related to the three representative victims. The total of these losses amounts to $81,801.

### 1. Counts of conviction

The conduct of which Schaefer was convicted generated $1,875 in loss. Schaefer does not dispute this amount.

### 2. Counts of acquittal

With respect to the counts of acquittal, excluding Count Two, which will be separately discussed, Judge Barker found that the essential elements of mail fraud and wire

fraud were satisfied by a preponderance of the evidence, and that there were no failures of proof as to any of these counts. (11/25/2002 Order at 7.) Specifically, the only feature distinguishing the mail fraud counts of conviction from the mail fraud counts of acquittal was the evidence, in the counts of conviction, of written misrepresentations corroborating the three representative victims' testimony of oral misrepresentations. (*Id.* at 7 n.1.) Since oral misrepresentations are sufficient, and since the standard for sentencing under the Guidelines is a preponderance rather than beyond a reasonable doubt, Judge Barker's inclusion of acquitted conduct was not clearly erroneous. Moreover, Schaefer does not dispute the inclusion of the counts of acquittal (except for Count Two). Adding the conduct of which Schaefer was acquitted (except for Count Two) brings the total amount of loss up to $37,914.

Count Two, on which Schaefer was convicted at trial, was later vacated by Judge Dillin because a description of the cel at issue had been removed by the Government from the envelope attached to the back of the cel and was not supplied to the defense. The purchaser of the cel could not remember his conversations with Schaefer about the cel but insisted, based on the price he paid, that the cel must have been represented as an original production cel.[5] The cel, however, was an original *hand-painted* cel, which had a lower value.[6] The "Official Description" in the envelope on

---

[5] An original production cel is a one-of-a-kind cel, the physical artwork actually used in the animation process, though it may not appear in the finished film. *See* http://www.mcguirefinearts.com/animationdefs.html (last visited August 23, 2004). Each hand-painted cel represents a slight change in position of the characters.

[6] A "hand-painted cel" may refer to a limited edition, hand-painted reproduction of an image from actual production cels used in
(continued...)

the back of the cel confirmed that the cel was an "original hand-painted cel," not an original production cel. Defense counsel was unable to impeach the purchaser's testimony because the "Official Description" had been removed, so Judge Dillin vacated the conviction on that count.

In resentencing Schaefer, Judge Barker nonetheless included the loss of $2,700 attributable to Count Two because she determined that Schaefer's conduct with respect to Count Two was fraudulent, being part of his overall fraudulent scheme. Thus, she concluded that, even if Count Two should not be included with the charged conduct, it would still qualify on the same grounds as the uncharged conduct. Also, the Government had characterized Schaefer's certificates of authenticity as misleading in themselves, and the Government's expert James Lentz testified that he had never seen a legitimate certificate of authenticity in the guise of an "Official Description" like the one attached to the back of the cel in Count Two. There is thus sufficient evidence in the record to support Judge Barker's determination that Schaefer's conduct with respect to Count Two was—"Official Description" notwithstanding—fraudulent. The inclusion of Count Two brings the total up to $40,614.[7]

---

[6] (...continued)
animations. *See* http://www.mcguirefinearts.com/animationdefs.html (last visited August 23, 2004). Less commonly, a "hand-painted cel" may be created for publicity purposes, usually depicting a character in an "ideal" pose. *See* http://www.animationartcollecting.com/collectables7definitions.html (last visited August 23, 2004).

[7] With respect to Schaefer's sentence, whether Count Two is included or not matters only if we also accept Schaefer's argument that the loss stemming from the uncharged conduct was overstated and/or unsupported. Otherwise, excluding the relatively small loss amount attributable to Count II would not affect

(continued...)

### 3. Uncharged conduct related to three representative victims

The final category of loss relates to uncharged conduct involving the three representative victims, which is discussed in the Government's sentencing materials (*i.e.*, the animation art sales to the three representative victims that were reviewed by the expert and discussed in detail by FBI Special Agent Robert Brouwer). Schaefer disputes the unlawfulness of some of the conduct as well as the loss calculations made by the government's expert Lentz and relied upon by the government and Judge Barker.

Schaefer argues that the district court erred in finding that all of his uncharged conduct with respect to these transactions was criminal, when on approximately half of the occasions, the government's expert stated that the artwork had been correctly described (though in some instances, the appraised fair market value was lower than the price paid). Schaefer asserts that "there is nothing fraudulent, and certainly nothing criminal, about describing a piece accurately but charging a different price" than that found by the government's expert to represent the market value of the piece. (Schaefer's Br. at 27 n.12.)

We first reiterate our finding in *Schaefer I*, now law of the case, that both Special Agent Brouwer and the government's expert Lentz were credible witnesses, whose testimony and affidavits we specifically suggested the district court could rely upon in making its loss calculation. *Schaefer I*, 291 F.3d at 943, 944. Thus, charging a higher price than that found by the expert, particularly after misrepresenting to his victims that he was selling art at below market value

---

[7] (...continued)
Schaefer's sentencing range, because the total loss amount would still be above $70,000, which represents the bottom of the loss amount range used by Judge Barker in sentencing him.

from his dead mother's estate, *was* criminally fraudulent. (*See* 11/25/2002 Order at 3.) Judge Barker moreover found that "the Defendant utilized the same methods and means to perpetrate his fraudulent course of conduct as he used in the counts of conviction" and that his sales to the representative victims were similar "in terms of subject matter, content and timing, and were thus part of the common scheme to defraud." (*Id.* at 7-8.) Thus, even if Schaefer's victims paid precisely market value (or less than market value) for a particular piece, the transaction could still have been criminally fraudulent. To cite an analogy, a fraudulent misrepresentation that a mutual fund is a "green" fund with a portfolio of stocks only from environmentally friendly corporations when the portfolio actually includes known polluters might induce environmentally conscious investors to purchase shares of the fund. Even if the fund's rate of return turns out to be the same or higher than it would have been if the composition of the portfolio had actually been "green," so that there is no monetary "loss," the misrepresentation may still be fraudulent even though the victims suffered no monetary loss. Thus, the district court did not err in finding that Schaefer's uncharged conduct with respect to the representative victims was fraudulent, whether or not the fraud resulted in monetary loss. Further, the district court correctly characterized any excess charges above market value (as determined by the government's expert) as monetary losses stemming from Schaefer's fraudulent conduct.

Schaefer also argues that the loss calculations were not reliable. However, not only could Schaefer have raised this issue on his first appeal, he also chose not to present alternative expert appraisals of his work. Since we already found in Schaefer's first appeal that Special Agent Brouwer and the government's expert Lentz were credible witnesses upon whose testimony the district court could rely in making loss calculations, Schaefer does not get a second bite at this

particular apple. Moreover, as we also noted in *Schaefer I*, the Guidelines require that "[t]he court need only make a reasonable estimate of the loss" which can be done by calculating "[t]he approximate number of victims multiplied by the average loss to each victim" or even more generally, by basing it on such factors as "the nature and duration of the fraud and the revenues generated by similar operations." U.S.S.G. § 2B1.1, cmt. n.3(C).[8] Thus, according to the Guidelines, in order to pass muster, loss calculations only need to be a reasonable estimate. We conclude that Judge Barker did not err in implementing her chosen methodology for calculating the losses attributable to Schaefer's fraudulent conduct.

## B.  Upward departures

Moreover, although the usual standard of review applicable to a district court's decision to depart from the presumptive sentencing guidelines range is de novo, 18 U.S.C. § 3742(e), Schaefer waived his objections to the district court's decision to depart upward by failing to raise them prior to or in conjunction with his resentencing. *See United States v. Marvin*, 135 F.3d 1129, 1135 (7th Cir. 1998); *United States v. Heilprin*, 910 F.2d 471, 474 (7th Cir. 1990). Thus, the standard of review applicable to the upward departures here is plain error. *United States v. DeAngelo*, 167 F.3d 1167, 1168 (7th Cir. 1999). We may reverse the district court's decision to depart upward by 3 sentencing levels only if there were "conspicuous" and "particularly egregious errors" causing a "miscarriage of justice." *Marvin*, 135 F.3d at 1135.

---

[8]  The United States Sentencing Guidelines Manual will be cited as "U.S.S.G." The 1997 version of the Guidelines Manual was used in calculating Schaefer's sentence, and our citations are to this version unless otherwise noted.

The Sentencing Guidelines allow upward departures if the court finds "that there exists an aggravating . . . circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the Guidelines that should result in a sentence different from that described." 18 U.S.C. § 3553(b). Our review of upward departures involves a three-step analysis: (1) the sentencing court must state adequate grounds to support the departure; (2) the facts cited to support the departure must exist in the record; and (3) the degree of departure must be linked to the structure of the Guidelines. *United States v. Peterson*, 256 F.3d 612, 614 (7th Cir. 2001). With respect to the third factor, Schaefer argues that Judge Barker was required, at minimum, to "draw an analogy between the defendant's actions and the conduct discussed in the Guidelines." *United States v. Raimondi*, 159 F.3d 1095, 1102 (7th Cir. 1998). However, although we have approved of the analogy method, it is not a necessary recourse in showing that the degree of departure is linked to the Guidelines' structure. *See, e.g., United States v. Leahy*, 169 F.3d 433, 445 (7th Cir. 1999) (finding that "there are no hard and fast rules for determining the extent of an upward departure," but noting that we have approved the analogy method); *United States v. Scott*, 145 F.3d 878, 886 (7th Cir. 1998) ("No rigid rule exists for computing an upward departure.").

Although Judge Barker departed upward by one level for each of three stated reasons, the general grounds supporting each departure are the same: that actual losses are present to a degree substantially in excess of those determinable with specificity, and the unquantifiable losses "fall outside the 'heartland' of conduct" embodied in the loss tables. (11/25/2002 Order at 10.) She found the present case to be atypical because the loss was present in an exceptional way, citing *United States v. King*, 150 F.3d 644, 650 (7th Cir. 1998).

While it is true that the evidence supports a finding that losses were substantially greater than the amount Judge Barker felt able to calculate "with the particularity required under the loss tables in U.S.S.G. § 2F1.1(b)(1)" (11/25/2002 Order at 11), this does not necessarily translate into support for using upward departures rather than attempting to estimate losses, particularly given the deferential standard under which sentencing judges are allowed to determine the amount of loss.[9] We acknowledge that there may be circumstances in which the use of an upward departure in lieu of an estimate of losses attributable to fraud might be appropriate, and that an inability to estimate the loss caused by the fraud may be one such circumstances. For example, the Fifth Circuit has found that in circumstances where the loss is not capable of determination, an upward departure is indeed appropriate. *See United States v. Garcia*, 900 F.2d 45, 48 (5th Cir. 1990). But *Garcia* is factually distinguishable from the situation at bar. In *Garcia*, the defendant had taken and destroyed a large volume of mail, and he made the same arguments that Schaefer makes here: that the Guidelines accounted for the amount of the loss—whether it be large or small—in the loss tables, and that therefore a loss of any amount within the range of the loss tables is within the contemplation of the Guidelines. Like Schaefer, "Garcia argue[d] that the incalculability of the loss resulting from his offense did not involve a circumstance that the Sentencing Commission failed to adequately consider, but rather resulted from

---

[9] The Guidelines allow the amount of an offender's gain to be used as an alternative estimate of the harm caused by the fraud if the loss sustained by victims cannot be readily estimated. *See United States v. Serpico*, 320 F.3d 691, 698 (7th Cir. 2003) (quoting U.S.S.G. § 2B1.1, cmt. n.2(B) (2001) ("The court shall use the gain that resulted from the offense as an alternative measure of loss only if there is a loss but it reasonably cannot be determined.' ")).

inaction on the part of the [prosecuting authority]." *Id.* But Garcia's destruction of the stolen mail made it impossible to quantify the monetary loss resulting from his crime.[10] Here, on the other hand, we approved of a methodology for making a reasonable estimate of losses in *Schaefer I*—namely, the 55% multiplier— and the district court chose not to use it. While the district court is correct that the losses caused by Schaefer's criminal conduct cannot be determined with particularity, the Guidelines do not require that the losses be determined with precision, only that a reasonable estimate be made. *See* U.S.S.G. § 2B1.1, cmt. n.8. Judge Barker did not attempt to make such an estimate. This leaves us in a bit of a bind. For while the law may support using Judge Barker's three reasons *in making loss calculations*, we have been pointed to no case law supporting the use of these reasons in *making upward departures*. Our analysis of each of these reasons follows.

Judge Barker departed upward by one level because of the losses Schaefer intended to cause in the future, which were not accounted for by her loss calculations. These intended losses were evidenced by Schaefer's $500,000 inventory of animation art that was seized by government officials, thereby preventing him from making additional fraudulent sales. The size of Schaefer's art inventory is factually supported by the record, as we noted in *Schaefer I*. And as we also stated in *Schaefer I*, a defendant's intended loss to victims is an appropriate consideration in making loss calculations. *See United States v. Strozier*, 981 F.2d 281, 284-85 (7th Cir. 1992). Since Judge Dillin's loss calculation of $231,000 "did not include any 'intended loss' that might be

---

[10] *United States v. Archambault* is distinguishable because the losses in that case were quantifiable, and they merely could not be included in the loss calculations due to the timing of the underlying criminal conduct. *See Archambault*, 62 F.3d 995, 1001 (7th Cir. 1995).

ascribed to Schaefer's entire $500,000 art inventory that was seized by government officials," it could on this basis be characterized as conservative. *Schaefer I*, 291 F.3d at 945. Judge Barker's loss calculation of $81,801 is likewise conservative. Although no effort has been made to quantify the intended loss attributable to this "well of future fraud" (Gov't Br. at 38), applying the 55% multiplier to the value of Schaefer's inventory (which, as the district court found, would eventually have been sold, despite Schaefer's protestations that it was merely being used to decorate his children's bedrooms) would indicate intended future losses of $275,000. This amount is more than enough to justify the size of the upward departure attributable to intended losses, since including this amount in the loss calculations would have brought Schaefer's Guidelines range up far more than the one level allocated by Judge Barker. The size of the departure is thus firmly linked to the Guidelines. Although attempting to reasonably estimate losses caused by fraud may be more in the spirit of the Guidelines than is the use of upward departures, we cannot in these circumstances say that Judge Barker's use of intended losses to justify a one-level upward departure rises to the level of a "conspicuous" and "particularly egregious" error causing a "miscarriage of justice." *Marvin*, 135 F.3d at 1135.

Judge Barker's second one-level upward departure is based on her finding that the size of the actual losses attributable to Schaefer's criminally fraudulent conduct was substantially greater than the amount she felt able to calculate with particularity, namely $81,801. Schaefer argues that this upward departure is erroneous, given Judge Barker's finding that it is "speculative" to claim that Schaefer's customers suffered more than $81,801 in losses. This argument, however, involves a mischaracterization of the district court's findings. Judge Barker merely found that it would have been speculative to try to come up with a precise amount based on the multiplier methodology, but

she knew (and the record supports her finding) that the loss amount would be much larger than $81,801. In fact, we would have approved use of the government's 55% multiplier, given Judge Barker's finding that all of Schaefer's fraudulent conduct was criminal, and this methodology would have validated Judge Dillin's loss calculation of $231,000. Hence, Judge Barker's use of a one-level upward departure to account for the difference between $81,801 and $231,000 is more than supported by the Guidelines' structure. While an attempt to estimate the amount would again have been preferable to resorting to an upward departure, we believe, under the circumstances of this case, that the district court's decision to depart upward by one level to account for the size of the actual losses is not an especially egregious error, and it does not rise to the level of a miscarriage of justice.

Judge Barker's third one-level departure is based on the unrealized appreciation promised to Schaefer's victims. Although, as we noted in *Schaefer I*, misrepresentations of a rate of return made in furtherance of a fraudulent scheme may in some circumstances be included in a loss calculation, *see United States v. Porter*, 145 F.3d 897, 901 (7th Cir. 1998), we do not believe that the circumstances here support the use of this rationale as the underpinning for an upward departure. We have never allowed unrealized appreciation to be used in a loss calculation without a guaranteed rate of return or other indication of a specific degree of appreciation. *See Porter*, 145 F.3d at 901 (allowing "unrealized appreciation" in loss calculation when a specified rate of return was guaranteed, and the victim was told in false account statements that his account had attained specific values); *United States v. Allender*, 62 F.3d 909, 917 (7th Cir. 1995) (explaining that future appreciation can be considered where there is "an enforceable agreement to pay a calculable sum"). This is because the Guidelines indicate that "loss" refers to "the value of the money, property, or

services unlawfully taken; it does not, for example, include interest the victim could have earned on such funds had the offense not occurred." U.S.S.G. § 2F1.1, cmt. n.7.

Here, although Schaefer's victims were admittedly unable to realize the "appreciation in value Schaefer told his consumers they would enjoy because he was selling his art-work at below-market prices," *Schaefer I*, 291 F.3d at 945, neither did Schaefer make specific representations as to the actual market value of those pieces. Thus, while Schaefer's victims may have had some indeterminate expectations of profit (either immediately or in the future), there was no enforceable agreement or guaranteed rate of return result-ing in a determinable amount of loss . The government argues that because this additional loss amount cannot be calculated, an upward departure is appropriate to "prevent the defendant from receiving no punishment for this real and substantial additional loss." (Gov't Br. at 33.) But, un-like the upward departures for Schaefer's intended future losses and for the larger-than-determinable actual losses, we have no way of determining whether this one-level upward departure is in any way linked to the structure of the Guidelines. The government's assertions that the size of this loss is "substantial" do not provide us with any means of determining whether one additional level is appropriate, or whether the amount of loss represented by "unrealized appreciation" is already accounted for by the existing loss calculations and upward departures. For this reason, we decline to extend our holdings in *Porter* and *Allender* with respect to loss calculations to support an upward departure based on indeterminate losses that may be attributable to "unrealized appreciation." Because the upward departure for "unrealized appreciation" is not supported under the Guide-lines as interpreted by our case law, we disallow it.

**IV.**

In light of *Blakely* and *Booker*, this case is remanded for resentencing. However, in the event that the Supreme Court decides that *Blakely* does not invalidate the federal sentencing Guidelines, we affirm Judge Barker's loss calculation of $81,801 and two of Judge Barker's three one-level upward departures, and we reverse with respect to the third one-level upward departure for unrealized appreciation. Since the Guidelines level Judge Barker arrived at was 21, whereas Judge Dillin's was 20, this would place Schaefer in the same sentencing range as Judge Dillin employed. Since we believe that Judge Barker would likely reimpose Schaefer's sentence of 37 months for the same reason she (and Judge Dillin) have previously imposed that sentence, a remand for resentencing in light of the lower applicable Guidelines range is unnecessary. *Cf. United States v. Emezuo*, 357 F.3d 703, 710-11 (7th Cir. 2003); *United States v. Wallace*, 32 F.3d 1171, 1174-75 (7th Cir. 1994).[11]

REVERSED and REMANDED for resentencing.

---

[11] Schaefer has also requested immediate release under bond from incarceration, since he has already served what would presumably be his sentence if the Guidelines are invalid. Based on the present state of the law in this circuit, this seems to be a meritorious request, but we leave this decision to the district court on remand. In this regard, the district court might wish to take note of Schaefer's earlier positions in this case with respect to unchallenged aspects of his sentence. *See Booker*, 375 F.3d at 510 (interpreting *Blakely* to allow sentences to be imposed based on "what the jury found or the defendant admitted *or, as here, did not contest*") (emphasis added).

A true Copy:

Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*